UNITED STATES of America,
Plaintiff, Appellant,

v.

Thomas STREIFEL, and Daniel J.
Quinn, Defendants, Appellees.

No. 84–1932.

United States Court of Appeals,
First Circuit.

Argued Aug. 6, 1985.

Decided Jan. 17, 1986.

Margaret D. McGaughey, Asst. U.S.
Atty., with whom Stephen L. Diamond, Wil-

liam H. Browder, Jr., Asst. U.S. Attys., and Richard S. Cohen, U.S. Atty., were on brief for plaintiff, appellant.

David C. Pomeroy with whom Wheeler, Pomeroy & Snitger, Richard S. Emerson, Jr., and Childs, Emerson, Rundlett, Fifield & Childs were on brief for defendants, appellees.

Before CAMPBELL, Chief Judge and BOWNES and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

The government appeals from an order of the United States District Court for the District of Maine suppressing certain statements and physical evidence seized in connection with the arrests of defendants-appellees Thomas Streifel and Daniel Quinn on the night of March 22, 1984, in Naples, Maine. The district court's opinion is reported as *United States v. Rule*, 594 F.Supp. 1223 (D.Me.1984). We vacate and remand.

## I. FACTS

### A. *Background*

In mid-1983, agents of the federal Drug Enforcement Administration ("DEA") and the Maine State Police ("MSP") began an investigation of John D. Rule and others for suspected marijuana trafficking. On March 22, 1984, an informant named James King, who had been referred to the DEA by the Boston Police Department after having assisted the Boston police in a cocaine investigation, told investigators that Rule was using a chalet-style house off Route 302 in Naples, Maine, as a "stash house" to store marijuana. King provided directions to the chalet and further informed investigators that a man called "Craig" was planning to remove approximately 300 pounds

of marijuana from the house in a rented red Mercury Marquis automobile.[1] King reported that he had seen Craig's rental car parked on Congress Street in Portland, Maine, and that he had left a note on it for Craig to meet him at a nearby restaurant called "The Bag."

Acting on King's information, DEA Agent Michael Cunniff found a red Mercury Marquis parked on Congress Street a short distance away from "The Bag." Agent Cunniff observed a man who was later identified as Craig Sterner climb into the red Marquis and drive to King's apartment on North Street, where Sterner stopped for ten minutes. With the aid of a surveillance aircraft, the red Marquis was then followed as it proceeded on Route 302 to Naples, following generally the directions King had provided, until it stopped at the chalet-style house. After a 15-minute stop at the chalet, the red Marquis proceeded to another house in Naples that investigators later learned was occupied by Dennis and Nancy Beckwith.[2]

The red Marquis left the Beckwith house after about half an hour and, following Route 302, went back to the Portland area, where it entered the southbound lane of the Maine Turnpike. At the direction of Agent Cunniff, the Marquis was stopped on the turnpike by an MSP cruiser. Upon request, the driver of the red Marquis produced a driver's license in the name of Craig Sterner. Believing the trunk of the Marquis contained contraband, Agent Cunniff opened it and discovered five bales of marijuana.

### B. *The Interrogation and Search of Streifel and Quinn at the Chalet*

We come now to the events that pertain directly to the subject of this appeal. These are best reported as the district

---

1. Prior to this date, King had told the DEA that Rule was a cocaine smuggler and that Rule used cars to transport marijuana. King had also reported that Rule had asked him to transport marijuana from Florida to New York in the trunk of a rented car. *Rule*, 594 F.Supp. at 1229.

2. A subsequent search of the Beckwith house revealed drug paraphernalia, several weapons, marijuana plants, and bales of marijuana. The district court suppressed this evidence as to the Beckwiths on the ground that it was the fruit of an unlawful search. *Rule*, 594 F.Supp. at 1236–38.

court described them in making its findings and rulings:

"After the discovery of marijuana in Sterner's car and his arrest, the DEA began the process of preparing to seek warrants to search both the houses in Naples at which Sterner had stopped on the afternoon of March 22. Police officers were sent to each of the houses in the early evening to 'secure' them for the arrival of the warrants. Four officers [3] arrived at the Cushner house [4] at 7:30 p.m. and determined that only a dog was in the house. Four officers staked out the house to await issuance of a warrant. Shortly after 10:30 p.m., while two of the officers [DEA Agent Steadman and MSP Corporal Holmes] were out making a phone call, two cars drove into the Cushner driveway. The first car, driven by Defendant Thomas Streifel, pulled up in back of one of the agent's cars. The other car, driven by Defendant Daniel Quinn, drove up in back of the Streifel car. The Defendants were asked by a uniformed officer for identification and to explain why they were at the cottage. Quinn produced a car registration in his name and Streifel produced his license and the rental agreement for his car. The identification was not returned to them during the succeeding course of events. Both Defendants were told by the officers [MSP Corporal Hutto and MSP Trooper Gallagher] when they arrived to put their cars in park and turn off the motors. They were told that they could not leave until Agent Steadman, the head of the operation, returned. When Quinn was asked if the officers could search his car, he refused, saying that they would have to get a warrant.

"Upon hearing by radio transmission of Quinn's and Streifel's approach, the two absent officers returned moments after Quinn and Streifel drove in. They parked their cruiser in back of Quinn's car in such a manner that neither Quinn's nor Streifel's car could be moved from the driveway. Agent Steadman testified that Quinn and Streifel had been told to get out of their cars and that they were deliberately kept apart. At that point they were clearly in custody. The officers who had blocked them in had no intention of letting them leave. Agent Steadman testified, in fact, that from the time Quinn and Streifel arrived he hoped and intended that they would stay. Also, he refused to allow Streifel to make a phone call. He explained this by saying that phone calls are only allowed after a person has been processed. Moreover, it is clear that a reasonable person in Defendants' position would have believed that he was not free to leave.... Initially Defendants had been told by C[orporal] Hutto that they could not leave. Later they were blocked in by a police car and confronted by four armed officers and a police dog. Their identification was retained by the officers.

"Since both Quinn and Streifel were in custody, they should have been advised of their rights before any questioning of them was begun.... The agent who did the questioning, DEA Agent Steadman, testified that he had no probable cause to arrest Quinn and Streifel when they arrived. According to his testimony, the probable cause began to develop from inconsistencies in their various responses to Steadman's questions concerning their purpose at the cottage, where they had previously met, and how long they had known each other. These theoretically incriminating responses, made as the result of the officer's interrogation of the Defendants while they were in custody, must be suppressed because they were made before Defendants were advised of their constitutional rights per *Miranda.*

3. The record indicates that six, not four officers were initially dispatched to the scene: DEA Agents Wayne Steadman and Dale Lear, MSP Corporals Howard Hutto and Douglas Holmes, Jr., MSP Special Agent Timothy Berry, and MSP Trooper Paul Gallagher. However, Agent Lear appears to have departed the scene altogether prior to the time that Streifel and Quinn arrived, and Special Agent Berry does not appear to have had any contact with the defendants.

4. The officers later determined that the chalet-style house off Route 302 in Naples was rented and occupied by Robert Cushner. *Rule*, 594 F.Supp. at 1233–34.

## A. Streifel

"In response to C[orporal] Hutto's request, Defendant Streifel consented to a search of his car. The voluntariness of that consent is immaterial here since the search revealed no incriminating evidence. When Cushner arrived [5] he told the officers that he recognized his friend Tom [Streifel] whom he was expecting for a few days of skiing. This information coincided with Streifel's expressed purpose for being at the cottage and was confirmed by skis and a suitcase seen in Streifel's car. The DEA had received no information from King concerning Streifel and, as will become evident *infra,* nothing revealed in the subsequent search of Cushner's house or in the check on Streifel's license provided any more indication, prior to his arrest, that he was involved in a violation of the law. Therefore, his arrest was premised merely on his late night arrival at a house which the agents suspected to be a stash house and his association with Cushner and Quinn. While such facts might give rise to suspicion, they do not rise to the level of probable cause necessary to arrest an individual for alleged participation in a drug conspiracy....

"Since Streifel's arrest was not based on probable cause, it was unlawful. The fruits of that unlawful arrest, the cocaine found in his pocket during the booking search, his telephone records, and the items found in the inventory search of his car, were 'come at by exploitation of that illegality,' rather than 'by means sufficiently distinguishable to be purged of the primary taint.' ... They are, therefore, inadmissible against him.

## B. Quinn

"After Agent Steadman's questioning of Quinn and Streifel, he busied himself with other matters while Trooper Gallagher twice circled Quinn's car with his trained dog. The dog twice 'alerted,' which indicated to the officers the possible presence of marijuana in the trunk of the car.

Quinn was asked if the officers could search the trunk and was warned that anything found in such a search could be used against him. Trooper Gallagher also told Quinn that if he did not permit the search, the agent could get a warrant. Quinn opened the trunk and the dog jumped in, signalling the presence of at least the odor of marijuana. The search revealed coffee grounds, marijuana seeds, and a blanket on which Gallagher smelled marijuana. Quinn asked that the dog be removed, which was done, and the trunk was closed. Shortly after these events, Agent Steadman, who had been told of the earlier search, asked Quinn if a subsequent search might be performed. Steadman testified that he made the request because he had concern about the legitimacy of the search of the trunk conducted by Trooper Gallagher. Steadman informed Quinn that the car would be subject to seizure if evidence showed that it had been used to transport drugs. Saying he understood, Quinn opened the trunk again, disclosing the same items plus some traces of baking soda.

"All the Defendants seek to suppress the fruits of the warrantless searches of Quinn's car. It seems clear that of all the Defendants, only Quinn, to whom the car was registered, and who was alone in it when it was stopped, has a Fourth Amendment privacy interest in the car....

"The Government argues that the search was consensual and, therefore, did not violate Quinn's rights....

"The officers here plainly sought to verify their suspicions by means that were the *equivalent* of arrest.... Having elicited unsatisfactory explanations with their unlawful interrogation, the officers sought to confirm the suspicions so created by using a dog to sniff for drugs in Quinn's car.... It was only after this procedure, made possible and suggested by the illegal detention and interrogation, that Quinn gave his consent to the search of his trunk. There was

---

**5.** The district court found that Cushner pulled up to the chalet in a blue pickup truck "[a]bout twenty to thirty minutes after Quinn and Streifel arrived." *Rule,* 594 F.Supp. at 1233.

no probable cause to arrest Quinn at the time he was detained. Since Quinn was being illegally detained when he consented to the search of his trunk, the consent was tainted by the illegality and could not justify the search."

*Rule,* 594 F.Supp. at 1231–33 (citations and footnotes omitted).

## II. DISCUSSION

The government raises principally three arguments on appeal. First, the government argues that the district court erred in finding that Streifel and Quinn were in custody when they uttered the disputed statements, and should have been advised of their rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before being questioned. The government contends that the detention and questioning of Streifel and Quinn were investigative stops as authorized in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, and that the police were not required to advise them of their *Miranda* rights before seeking an explanation for their presence at the chalet.[6] Second, the government maintains that, because Quinn was not under arrest at the time that he consented to the searches of his trunk, the fruits of these searches should be admissible in evidence. Third, the government argues that, because Quinn consented to the search of his trunk and the defendants' statements were not elicited in violation of *Miranda,* there was probable cause for Streifel's warrantless arrest, rendering the evidence discovered during the booking search of Streifel and the inventory search of his car admissible.

▬ Our disposition of this case requires us only to address briefly the first of the government's arguments. The Su-

preme Court has articulated a dual inquiry for evaluating the reasonableness of an investigative *"Terry* stop." A reviewing court is to inquire

"whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

*United States v. Sharpe,* —— U.S. ——, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (*quoting Terry,* 392 U.S. at 20, 88 S.Ct. at 1879). Although the district court expressed no view on the question, we have little difficulty concluding that, when Streifel and Quinn drove into the driveway of the chalet, Corporal Hutto and Trooper Gallagher, the two officers at the scene, were entitled to effect a lawful *Terry* stop in order to question them briefly as to their identity and purpose in coming to the chalet. A limited investigative stop of a person is reasonable under the fourth amendment if the police have an articulable and reasonable suspicion that he is engaged in criminal activity. *United States v. Sharpe,* 105 S.Ct. at 1573; *United States v. Berryman,* 717 F.2d 650, 663 (1st Cir.1983) (en banc), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984). Here, as the district court concluded, the police had probable cause to believe that the chalet was being used in a drug trafficking conspiracy based on corroborated information provided by the informant King and the movements and search of the Sterner vehicle. *Rule,* 594 F.Supp. at 1234. In turn, Streifel and Quinn's arrival in tandem at the chalet in the dead of night with a rental car[7] gave rise to an articulable and reasonable suspicion sufficient to warrant a *Terry* stop. *See Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

6. At oral argument, the government abandoned the argument made in its brief that the detention of Streifel and Quinn was nothing more than a voluntary encounter of the kind described in *United States v. Berryman,* 717 F.2d 650, 660–61 (1st Cir.1983) (en banc), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984).

7. Streifel's arrival in a rental car was significant because, based on information provided by the informant King and the stop of Sterner earlier in the day, the police had reason to believe that it was Rule's practice to transport marijuana in rented vehicles.

That the investigative stop of Streifel and Quinn was justified at its inception does not end the inquiry, however, for " '[t]he manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all.' " *United States v. Ogden,* 703 F.2d 629, 634 (1st Cir.1983) (*quoting Terry,* 392 U.S. at 28, 88 S.Ct. at 1883). As a general rule, *Terry* stops do not implicate the requirements of *Miranda,* because "*Terry* stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings." *United States v. Bautista,* 684 F.2d 1286, 1291 (9th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983). However, the Supreme Court has recently said in *Berkemer v. McCarty,* 468 U.S. 420, ____, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984), that a person who has been *Terry* stopped must be advised of his *Miranda* rights if and when he is "subjected to restraints comparable to those of a formal arrest." *See also California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3519–20, 77 L.Ed.2d 1275 (1983) (per curiam); *Borodine v. Douzanis,* 592 F.2d 1202, 1208 (1st Cir.1979).

The district court apparently took the view that the circumstances surrounding Streifel and Quinn's detention were tantamount to those of a formal arrest from the moment that they arrived at the chalet, because it suppressed all the statements that they made to the investigating officers, not just statements they made at some later point in their interrogation when, arguably, greater constraints had been placed upon them. In support of its decision that all of Streifel and Quinn's statements had to be suppressed because no *Miranda* warnings were given, the district court relied upon the following findings: (1) when Streifel and Quinn arrived at the chalet, they were told to put their cars in park and turn off their motors; (2) once taken, their identification was not returned to them during the succeeding course of events; (3) they were told that they were not free to leave until Agent Steadman returned; (4) Steadman and Holmes parked their MSP cruiser behind Quinn's car, blocking Streifel and Quinn's exit; (5) Streifel and Quinn were told to get out of their cars and were deliberately kept apart from one another; [8] (6) Steadman and Holmes had no intention of letting them leave; (7) Steadman refused to allow Streifel to make a phone call; [9] (8) Streifel and

---

**8.** While conceding that "Steadman questioned [Streifel and Quinn] separately by design," the government challenges this finding on the ground that "it does not appear that any action or communication was required to keep them apart." We agree that Steadman's subjective intentions were beside the point; the relevant question was whether reasonable persons in the defendants' position would have felt that they were being kept apart. *Berkemer v. McCarty,* 468 U.S. 420, ____, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984). However, there was evidence from which the district court could have so found. Not only did Trooper Gallagher testify that he expressly told Streifel to remain with his vehicle, but the manner in which the defendants were questioned in turn by a series of officers plainly discouraged them from conferring with one another, regardless of whether they were physically restrained from moving about.

**9.** The government argues that there was insufficient evidence to support the district court's finding that Streifel ever asked Steadman if he could make a phone call. Streifel did not testify at all at the suppression hearing. However,

Agent Steadman testified as follows on cross-examination:

Q. Do you recall [Streifel] asking you if he could make a phone call prior to being at the Cumberland County Jail?
A. He may have. I don't recall it. But I wouldn't have allowed him to make the phone call anyway, sir.

\*　\*　\*　\*　\*　\*

Q. All right. Did he ask to make a phone call at the scene prior to the time, we will say, you searched his vehicle?
A. He may have, sir. I don't recall.
Q. Did you let him?
A. I wouldn't have, no, sir. No one was allowed to make a phone call.

The district court's findings of fact must stand unless they are clearly erroneous. *E.g., United States v. Regan,* 687 F.2d 531, 535 (1st Cir.1982). In our view, Steadman's testimony provides sufficient if minimal support for the district court's finding; the court may have inferred from Steadman's demeanor that he was conceding the point notwithstanding his statement that he did not recall. *Cf. SEC v. MacDonald,* 725 F.2d 9, 11 (1st Cir.1984) (per curiam) (district court

Quinn were confronted by four armed officers and a police dog;[10] and (9) they were not told that they were free to leave. *Rule*, 594 F.Supp. at 1231–32.

As an initial matter, to the extent that the district court based its conclusion that Streifel and Quinn were in custody on the uncommunicated intent of the police to prevent the defendants from leaving the chalet, it was in error. As the Supreme Court stated in *Berkemer v. McCarty*, 104 S.Ct. at 3152 (footnote omitted), "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Thus, in determining whether Streifel and Quinn were "in custody" for the purposes of *Miranda*, Steadman and Holmes's intentions were relevant only to the extent that they were communicated to the defendants. *Cf. United States v. Mendenhall*, 446 U.S. 544, 554 & n. 6, 100 S.Ct. 1870, 1877 & n. 6, 64 L.Ed.2d 497 (1980) (subjective intent of police irrelevant to determination whether defendant was seized within the meaning of the fourth amendment); *United States v. Vargas*, 633 F.2d 891, 896 & n. 10 (1st Cir.1980) (same).

Furthermore, we see nothing in the initial detention of the defendants by Corporal Hutto and Trooper Gallagher which exceeded the bounds of a permissible *Terry* stop. That Streifel and Quinn were asked to turn their motors off and step out of their vehicles upon arrival at the chalet did not render them in custody, for it is settled that such a minor intrusion on a citizen's personal security is far outweighed by the government's interest in ensuring officer safety. *Michigan v. Long*, 463 U.S. 1032, 1047–48, 103 S.Ct. 3469, 3479, 77 L.Ed.2d 1201 (1983); *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11,

98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (per curiam); *United States v. Jones*, 759 F.2d 633, 741 (8th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). There is nothing in the record to suggest that Hutto and Gallagher's initial inquiries concerning the defendants' identity and purpose in coming to the chalet constituted anything more than a reasonable attempt to verify or dispel the officers' suspicions. *See Berkemer v. McCarty*, 104 S.Ct. at 3150–51. Finally, that Streifel and Quinn were told that they could not leave until Agent Steadman, the head of the investigation, returned, did not render the stop so unreasonable as to elevate it into a custodial situation requiring *Miranda* warnings.[11] Steadman and Holmes were promptly notified by police radio of Streifel and Quinn's arrival at the chalet and, acting upon this information, they returned immediately to the scene.

In *United States v. Sharpe*, 105 S.Ct. at 1575, while cautioning that there is no "hard-and-fast time limit for a permissible *Terry* stop," the Supreme Court recently held that a 20-minute investigatory detention was reasonable where, like Hutto and Gallagher, the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." In *Sharpe*, a police officer stopped the driver of a truck on suspicion that he was transporting marijuana, ordered him out of the truck at gunpoint, frisked him, and then held him for approximately 15 minutes pending the arrival of the officer's superior. While there were some distinguishing features in *Sharpe*, it was error for the district court to suppress the responses Streifel and Quinn gave to the questions posed by Trooper Gallagher and Corporal Hutto pending Steadman and Holmes's re-

has wide latitude in evaluating the credibility of witnesses).

10. As we indicate, *supra,* note 3, although the district court concluded that the defendants were "confronted" by only four officers, it is clear from the record that a fifth officer, Special Agent Berry, was also present at the scene, al-

though he does not appear to have spoken with either Streifel or Quinn.

11. The record indicates that Streifel and Quinn were required to wait for approximately five minutes before Steadman and Holmes returned.

turn.[12] *See United States v. Chamberlin,* 644 F.2d 1262, 1267 (9th Cir.1980), *cert. denied,* 453 U.S. 914, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981).

If, as we hold, the initial detention of Streifel and Quinn was not custodial for the purposes of *Miranda,* the question then becomes whether and when the lawful, investigatory *Terry* stop of Streifel and Quinn matured into custodial interrogation necessitating the administration of *Miranda* warnings. After careful consideration, we believe that this court should not attempt to resolve this difficult question on the findings before it, but rather should remand so that the district court may make the factual findings necessary in applying the correct standard.

 The district court mistakenly thought that the principal criterion for determining whether Streifel and Quinn were in custody for the purposes of *Miranda* was whether "a reasonable person in Defendants' position would have believed he was not free to leave." *Rule,* 594 F.Supp. at 1231; *see also id.* at 1234. The Supreme Court has recently made clear, however, that this is the standard for determining whether a person has been seized within the meaning of the fourth amendment, but is not alone determinative of whether he has been placed in custody for the purposes of the fifth. In *Berkemer v. McCarty,* the Court expressly recognized that an ordinary traffic stop curtails the freedom of the detained vehicle's occupants to drive away. Nonetheless, the Court held that such stops are usually analogous only to a *Terry* stop, and so not subject to the dictates of *Miranda.* Although the stop in the case at bar was in a number of respects distinguishable from the ordinary traffic stop discussed in *Berkemer,* the *Berkemer* Court's reasoning is instructive. The Court said,

It must be acknowledged at the outset that a traffic stop significantly curtails the "freedom of action" of the driver and the passengers, if any, of the detained vehicle. Under the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission.... Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so. Partly for these reasons, we have long acknowledged that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief." ...

Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, we must decide whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights....

[T]he usual traffic stop is more analogous to a so-called "*Terry* stop," ... than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." ... "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" ... Typically, this means that the officer may ask the detainee a moderate number of questions to

---

**12.** Although *Sharpe* was decided subsequent to the events at issue in the case at bar, we see no reason why it should not be given retroactive application. *See, e.g., United States v. Burns,* 684 F.2d 1066, 1074 (2d Cir.1982) ("[Fourth amendment] [c]ases refusing to apply decisions retroactively have generally involved good faith searches by police officers that later became plainly unconstitutional under intervening Supreme Court decisions."), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda.* The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda.*

104 S.Ct. at 3149–51 (citations and footnotes omitted). Thus, *Berkemer* indicates that, in a non-stationhouse setting, *Miranda* is *not* triggered simply because a person detained by the police has reasonable cause to believe that he is not free to leave. Rather, a host of factors must be considered in order to determine whether the "suspect's freedom of action is curtailed to a '*degree associated with formal arrest.*'"[13] *Berkemer,* 104 S.Ct. at 3151 (emphasis added) (*quoting California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3519–20, 77 L.Ed.2d 1275 (1983)). In making this determination, the court must decide whether the stop "exerts upon [the] detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer,* 104 S.Ct. at 3149.

In the instant case, it is not clear that the district court was focusing on the appropriate standard for determining whether the defendants were "in custody"

for the purposes of *Miranda.* While the court indeed stated that Streifel and Quinn were "in custody" and that their detention was "equivalent to arrest," it did not show awareness that their detention might have been—and for some initial period, at least, was—a lawful *Terry* stop that did not implicate *Miranda.* Moreover, the court did not seem to recognize that whether and when the detention became custodial interrogation requiring *Miranda* warnings turned on a weighing of the kind of factors mentioned above, *see* note 13, *supra,* and could not be resolved simply by inquiring whether or not a reasonable person in the defendants' position would have felt free to leave.[14]

To be sure, the district court did mention a few of the factors that are relevant to a determination of custody for the purposes of *Miranda.* For example, the court took account of both the blocking of the defendants' vehicles[15] and the number of police at the chalet, viewing the sizeable police presence as aggravating the conditions of the defendants' detention. *Rule,* 594 F.Supp. at 1232. The district court may also have considered other relevant factors that it did not mention. But because the court determined that Streifel and Quinn did not feel "free to leave" from the moment that they arrived at the chalet, and because it seems to have regarded this as largely dispositive of the issue of custody for *Miranda* purposes, it did not make all the findings from which it can be ascertained whether a reasonable person in defendants' position would have believed, not merely that he was not free to go, but that he was actually in custody and "at the mercy of the police." *Berkemer,* 104 S.Ct. at 3150. Among the

13. Among the factors to be considered are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation. *See* 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.6, at 494–99 (1984).

14. This is not said by way of criticism of the able and conscientious district judge. This is a swiftly evolving area of law in which, to the

present day, the precise contours of applicable constitutional standards remain less than clear.

15. We note in passing that while the blocking of a vehicle is relevant to the issue of custody, it would not necessarily elevate an investigatory stop into a de facto arrest requiring probable cause. *See United States v. Vargas,* 633 F.2d 891, 896 (1st Cir.1980); *see also United States v. Jones,* 759 F.2d 633, 637 (8th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985).

findings that are lacking is precisely when, if ever, prior to the defendants' formal arrest, a custodial situation requiring *Miranda* warnings arose. The district court is in the best position to sort out the record and make the additional necessary findings conforming to the caselaw cited above.

We therefore vacate and remand. In an extremely close case such as this, with a record that admits of conflicting interpretations, a court of appeals is ill-equipped to undertake its own de novo assessment of the facts against the proper standard. On remand, the district court should inquire whether and when a reasonable person in Streifel and Quinn's position would have believed that he was actually in police custody and being constrained to a degree associated with formal arrest (rather than simply undergoing a brief period of detention at the scene while the police sought by means of a moderate number of questions to determine his identity and to obtain information confirming or dispelling their suspicions). In making this determination, the district court should pay particular attention to the Supreme Court's recent admonition in *United States v. Sharpe*, 105 S.Ct. at 1575–76, that "[i]n assessing whether a detention is too long in duration to be justified as an administrative stop," it is

> appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.... A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

(Citations omitted.) If the district court determines that Streifel and Quinn were placed in custody within the meaning of *Miranda* before they were advised of their rights, it may order suppressed any statements elicited in violation of *Miranda,* and, in light of its order, it should also make such rulings concerning the suppression of other evidence as it deems appropriate. On remand, the court may, but is not required to, take additional evidence, and may reopen and redetermine any issue covered in this appeal as, in its discretion, it sees fit.[16] The parties will, of course, retain their usual rights of appeal in respect to all such orders made on remand.

We express no view on the ultimate disposition of the defendants' motions to suppress, because this necessarily involves fact-specific assessments and inquiries which the district court is in the best position to make.

Because our vacation of the district court's order does not occur under circumstances that are likely to affect the court's continuing objectivity, and because the original district judge's "familiarity with the evidence and with the demeanor of witnesses who presented conflicting testimony" is likely to expedite matters on remand, we return the case to the same, not to a different, judge. *Blizard v. Frechette*, 601 F.2d 1217, 1222 n. 2 (1st Cir.1979); *see also O'Shea v. United States*, 491 F.2d 774, 778–80 (1st Cir.1974).

*The order of the district court is vacated and remanded for further proceedings consistent with this opinion.*

---

**16.** In this connection, and without our expressing any view on how the matter should be resolved, the court may wish to review its findings relating to the warrantless searches of Quinn's car in light of the Supreme Court's decisions in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and *Oregon v. Elstad,* —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).