**UNITED STATES of America**

v.

**Daniel J. QUINN.**

**Crim. No. 84–00016 P.**

United States District Court,
D. Maine.

April 21, 1986.

Richard S. Cohen, U.S. Atty., Margaret D. McGaughey, Asst. U.S. Atty., Portland, Me., for plaintiff.

James M. Merberg, Boston, Mass., for defendant.

## ORDER ON DEFENDANT QUINN'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

This case is here on remand from the Court of Appeals for the First Circuit for redetermination of Defendant Quinn's motion to suppress certain statements and physical evidence seized in connection with his arrest on the night of March 22, 1984, in Naples, Maine.[1] The events pertinent to the suppression motion have been set out both in this Court's earlier opinion, reported as *United States v. Rule*, 594 F.Supp. 1223 (D.Me.1984), and in the Court of Appeals' opinion, reported as *United States v. Streifel*, 781 F.2d 953 (1st Cir.1986). The facts found in the Court's prior opinion will be modified and supplemented in this opinion as required to conform to the mandate of the Court of Appeals.

The Court of Appeals held that the initial detention of Defendants Quinn and Streifel at the Cushner cottage was not custodial for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As the Court of Appeals phrased it, "the question then becomes whether and when the lawful, investigatory *Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] stop of Streifel and Quinn matured into custodial interrogation necessitating the administration of Miranda warnings." *Streifel* at 960. This Court accepts, as it must, the appellate Court's holding that at least the early stages of Quinn's detention were a legitimate *Terry* stop and passes to a determination of the duration of the aura of legitimacy thereby created.

In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court, examining routine traffic stops, provided guidance for determining the point at which a police detention "exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id.*, at ——, 104 S.Ct. at 3149, 82 L.Ed.2d at 333. As the Court stated: "It is settled that the safeguards prescribed by *Miranda* became applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Id.*, at ——, 104 S.Ct. at 3151, 82 L.Ed.2d at 335 (*quoting California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)).

1. Defendant Streifel entered a guilty plea on April 14, 1986, so his motion is now moot.

The Court is satisfied that Quinn's freedom of action became so curtailed when Officers Steadman and Holmes returned to the Cushner cottage and parked their cruiser in such a manner that neither Defendant's car could be moved from the driveway. The Court is aware that the blocking in of Defendants' cars by itself does not necessarily elevate the *Terry* stop to an arrest. *Streifel,* 781 F.2d at 961, n. 15. In this case, however, the Court is fully satisfied that this conduct, in the total factual context then existing, was a determining factor tipping the balance of the evidence in favor of a finding of the occurrence at that point in time of a custodial arrest of the Defendants Quinn and Streifel.

One of the hallmarks of a traffic stop rendering it more like a *Terry* stop than like a formal custodial arrest is the fact that it is presumptively temporary and brief. *Berkemer,* 468 U.S. at ——, 104 S.Ct. at 3149–50, 82 L.Ed.2d at 333. As the Court stated, a motorist's expectations when he is stopped are that he will answer a few questions and be on his way. That was not the most reasonable construction of the instant situation, however. Here, the Defendants might have expected a few questions from Officers Hutto and Gallagher and perhaps a few from the absent Steadman who, they had been told, would return soon. When Steadman and Holmes returned, however, having received a radio message from the officers at the scene, they affirmatively chose to block Defendants in. The situation thus became less like a brief and spontaneous traffic or *Terry* stop, *see Berkemer,* at ——, n. 27, 104 S.Ct. at 3150, n. 27, 82 L.Ed.2d 333, n. 27, and more like a station house interrogation "which frequently is prolonged, and in which the detainee often is aware that the questioning will continue until he provides his interrogators the answers they seek." *Id.,* at ——, 104 S.Ct. at 3150, 82 L.Ed.2d at 333. This was the most reasonable explanation for the officers' display of force, for there was no indication that Defendants had been driving or acting erratically so that the blocking was necessary for the officers' safety. *See United States v. Ce-*

*ballos,* 654 F.2d 177 (2d Cir.1981). Also, with three officers already at the scene, and the situation under control, there was little danger that Defendants might flee upon the approach of the other officers. *See United States v. Jones,* 759 F.2d 633, 638 (8th Cir.1985). Under these circumstances, the blocking turned a "presumptively temporary and brief" stop into one fraught with pressure for Defendants Quinn and Streifel.

The Supreme Court in *Berkemer* also distinguished the atmosphere surrounding traffic stops and *Terry* stops as being far less police-dominated than situations surrounding *Miranda*-type interrogations. *Berkemer,* 468 U.S. at ——, 104 S.Ct. at 3150, 82 L.Ed.2d at 334. The Court finds that the situation in which Defendants found themselves can most reasonably be described as police-dominated. As the Court of Appeals noted, when Officers Steadman and Holmes returned to the Cushner cottage there were five policemen at the scene as well as a large, trained police dog. The identification and automobile registration which Defendants had initially given to the officers were not returned to them. *See Florida v. Royer,* 460 U.S. 491, 503–04, 103 S.Ct. 1319, 1327–28, 75 L.Ed.2d 229 (1983). Also, they were kept apart. From their separate and serial questioning by the officers, Defendants would reasonably have known that this was a police strategy to keep them from conferring with one another. *See Berkemer,* 468 U.S. at ——, 104 S.Ct. at 3149–50, 82 L.Ed.2d at 333; *Streifel* at 958, n. 8. They also might reasonably have concluded that the officers, who had had the opportunity briefly to confer, might with this strategy try to trick them into confessing. *See Berkemer,* 468 U.S. at ——, n. 27, 104 S.Ct. at 3150, n. 27, 82 L.Ed.2d at 833, n. 27. Finally, the interrogation of Quinn and Streifel, while not conducted at the station house, was not public in the way that most traffic stops are. As the Court stated in *Berkemer:*

Passersby, on foot or in other cars, witness the interaction of officer and motor-

ist [during a routine traffic stop]. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. *Berkemer*, at ——, 104 S.Ct. at 3150, 82 L.Ed.2d at 334. Here, instead, Defendants were confronted by a large group of armed law enforcement officers, late at night at a remote cottage in the Maine woods.[2] Since the stop occurred in the darkened yard, well off any well-traveled public road, it was unlikely that anyone, except perhaps Cushner, would happen by. Having been blocked in at this remote spot, Defendants had reason to feel at the mercy of the police and to feel that they would be detained indefinitely until they satisfied the police.

■ The Court finds, therefore, that from the time Officers Steadman and Holmes arrived back at the cottage, the atmosphere was threatening enough and coercive enough to warrant the administration of *Miranda* warnings.[3] Since the warnings were not administered until later in the evening, Defendant Quinn's statements made after the arrival of Officers Steadman and Holmes must be suppressed.

Since the Court has determined that the *Terry* stop of Defendants ended when Steadman and Holmes· returned and blocked Defendants' cars in the Cushner driveway,[4] it must now determine what other evidence should be suppressed.[5] The Court still finds the discussion in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983),[6] helpful to its analysis, for it seems clear that the *de facto* arrest to which Defendants were subjected when the *Terry* stop ended has Fourth Amendment, as well as possible Fifth Amendment, implications. As Justice White stated in *Royer:*

> Detention may be "investigative" yet violative of the Fourth Amendment absent probable cause to arrest. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or his automobile or other effects. Nor may police seek to verify their suspicions by means that approach the conditions of arrest.

460 U.S. at 499, 103 S.Ct. at 1325.

■ After consideration of the initial responses given to Officers Hutto and Gallagher during the *Terry* stop, as well as the circumstances surrounding Defendants' arrival at the cottage, the Court still believes that there was no probable cause to arrest Quinn at the time he was placed under *de*

---

**2.** Although this cottage had been Defendants' destination, it was not their home and, given the remoteness, darkness and number of policemen, could not be regarded as a neutral, nonthreatening environment.

**3.** The Court recognizes that there was nothing inherently coercive or threatening about the duration of the questioning. *See United States v. Sharpe*, —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The circumstances surrounding the questioning, however, would have led a reasonable person in Defendants' position to believe he was being constrained to a degree equal to formal arrest rather than undergoing a brief period of detention at the scene while police sought to determine identity and confirm or dispel their suspicions with a moderate number of questions. *See Streifel* at 962.

**4.** The Court disagrees with the Government's assertion that the Court of Appeals concluded "that Quinn and Streifel were lawfully detained

at least long enough for S/A Steadman to inquire of their identities and purpose for arriving at the Cushner property." Government Memorandum at 17. The Court stated: "[W]e see nothing in the initial detention of the defendants *by Corporal Hutto and Trooper Gallagher* which exceeded the bounds of a permissible *Terry* stop.... it was error for the district court to suppress the responses Streifel and Quinn gave to the *questions posed by Trooper Gallagher and Corporal Hutto pending Steadman and Holmes's return." Streifel*, 781 F.2d at 959–60 (emphasis added).

**5.** Again, the description of events, including the searches of Quinn's car, is found in *Streifel*, 781 F.2d at 956–57, and *Rule*, 594 F.Supp. at 1232–33.

**6.** The Court assumes, as did Justice Marshall in his concurring opinion in *United States v. Sharpe*, 105 S.Ct. at 1574, n. 4, that *Royer* is still good law.

*facto* arrest by the blocking in of his car. *See Rule,* 594 F.Supp. at 1233. The officers merely had suspicions and they were not, as *Royer* points out, entitled to verify those suspicions by means approaching the conditions of arrest. *Royer,* 460 U.S. at 499, 103 S.Ct. at 1325. The use of Solomon to determine the presence of drugs in the cars would have been appropriate in a *Terry* stop situation. *See United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Once that stop had ended and Defendants were under *de facto* arrest, however, the police, obviously dissatisfied with previous explanations, could not use this means to confirm their suspicions and so, perhaps, build probable cause. *See Royer,* 460 U.S. at 503, 103 S.Ct. at 1327.

■ It was only after Solomon alerted, a situation made possible by the illegal detention, that Quinn gave his consent to the search of his trunk. Since he was being illegally detained when he consented to the searches, the consent was tainted by the illegality and could not justify the search. *Id.* at 506, 103 S.Ct. at 1329.

The Court of Appeals suggested that this Court re-examine its rulings concerning the searches of Quinn's car in light of two Supreme Court decisions, *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Court does not, on the facts of this case, find *Elstad* helpful. In that case, the Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad,* 470 U.S. at ——, 105 S.Ct. at 1285, 84 L.Ed.2d at 222 (1985). In this case, however, the Court does not find that the taint of the searches of Quinn's car resulted from the failure of the officers to administer *Miranda* warnings which, according to the *Elstad* Court, might or might not be a Fifth Amendment violation. Rather, the taint resulted from the Fourth Amendment violation occasioned by Defendant's *de facto* arrest without probable cause.

In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, the Court dealt with a taint caused to subsequent statements by a prior illegal arrest and held that *Miranda* warnings by themselves, cannot always purge such taint. The Court stated: "In order for the causal chain to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown v. Illinois,* 422 U.S. at 602, 95 S.Ct. at 2261 (*quoting Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Both *Brown* and *Elstad* are cases about subsequent statements. To the extent that the Court of Appeals was suggesting that these cases instruct that the consent to search Quinn's car might have been voluntary and, therefore, valid despite the illegal detention of Quinn, it is clear that they must at least meet the test set forth in *Brown* that the causal chain of illegality be broken.

It seems clear to the Court that, as in *Royer,* the taint remained at the time Quinn's consent was given, thus invalidating the searches. From the time Quinn was detained to the time he consented, nothing had changed to lessen the aura of police domination, and nothing had intervened to purge the taint of the illegal detention. Less than an hour had passed from the first encounter and he was still blocked in; the police were still holding his automobile registration. Moreover, the officers had told Quinn that if he did not consent to the search they could get a warrant. Thus, even though he was told he did not have to consent to the search, under the circumstances,

> there was a clear implication that [defendant] would be retained in custody until the warrant was obtained. The only reasonable construction [defendant] could place on the agent's statement was that [he] would not be permitted to frustrate the agent's attempts by [leaving] and thus placing himself beyond reach of

the very warrant which the agent sought to obtain.

*United States v. Ocheltree*, 622 F.2d 992 (9th Cir.1980); *see also United States v. Faruolo*, 506 F.2d 490, 495 (Newman, J., concurring) (2d Cir.1974) (discussing impact of threat to obtain warrant). The sense of the futility of refusing to permit a search, engendered by the officers' threat to get a warrant, would have been felt even by someone like Quinn, who represented himself to the officers to be a lawyer, for he was blocked in and deprived of his automobile registration. This sense of futility and of the inevitability of the warrant would obviously have been compounded by Solomon's illegal "sniffs." Under all the circumstances, therefore, the Court cannot find that Defendant's consent was anything but entwined in, and the direct product of, his illegal detention. At best, it can be described as a mere submission to the officers' show of force and claim of lawful authority. *See Royer*, 460 U.S. at 497, 103 S.Ct. at 1323–24. Since the Defendant's consent was not "sufficiently an act of free will to purge the primary taint," *Brown*, 422 U.S. at 602, 95 S.Ct. at 2261 (*quoting Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416), the fruits of the two warrantless searches of Quinn's trunk must be suppressed.

The Court has also re-examined the affidavits supporting the warrant search of Quinn's car in light of its new determination on this motion. Since it is still necessary to exclude from consideration Quinn's statements to Steadman, the results of Solomon's "sniff test" and Agent Cunniff's statements about the results of consent searches, there is still no basis for a finding of probable cause supporting issuance of a warrant.

Accordingly, it is ORDERED that:

(1) All statements made by Defendant Quinn to the police after Officers Holmes and Steadman returned to the Cushner cottage, blocking them in, be, and they are hereby, SUPPRESSED.

(2) The results of the canine sniff test of Quinn's car be, and they are hereby, SUPPRESSED.

(3) The fruits of the two warrantless searches of Quinn's car be, and they are hereby, SUPPRESSED.

(4) The fruits of the warrant search of Quinn's car be, and they are hereby, SUPPRESSED.