UNITED STATES of America

v.

ELIAS, Hadi Hanna Habib, Appellant.

No. 87–3194.

United States Court of Appeals,
Third Circuit.

Argued Oct. 2, 1987.

Decided Oct. 27, 1987.

Carmen F. Lamancusa (argued), Lamancusa & Cilli, New Castle, Pa., for appellant.

Constance M. Bowden (argued), Asst. U.S. Atty., J. Alan Johnson, U.S. Atty., Pittsburgh, Pa., for appellee.

Before SEITZ, GREENBERG and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Appellant Hadi Hanna-Habib Elias sought suppression of physical evidence found in his car and of a statement made prior to being advised of his *Miranda* rights. After a hearing, the District Court denied suppression of both the evidence and the statement. Elias thereafter entered a conditional guilty plea to the charge of possession of cocaine with intent to distribute, reserving the right to appeal the denial of suppression. Because we find the District Court to have committed clear error with regard to the statement, we will reverse in part, vacate the judgment of conviction of the District Court, and remand for further factual findings on the question of whether Elias was in police "custody" for purposes of his right to *Miranda* warnings at the time of his statement.

## I. BACKGROUND

The following recitation of facts is based on the essentially undisputed parts of the record of the suppression hearing. Following a rash of burglaries and incidents of vandalism, the New Castle, Pa. School District hired Constable Anthony Mangino to patrol the New Castle schools and prevent unauthorized persons from remaining on school grounds after hours. During such a patrol, Constable Mangino discovered appellant and a female companion parked in the driveway behind the Lockley School in New Castle. Mangino, wearing a uniform but in an unmarked car, drove up and parked directly in front of Elias's car, with his high beams on and directed towards Elias. He then asked Elias why he was parked in the school driveway and asked to see a driver's license and vehicle registration.

Elias produced a California license which appeared to have expired and which seemed to have had the address entry manually altered; he did not produce any vehicle registration. He attempted to explain the irregularities of the license, and told Mangino that although he resided in California, he had purchased the car in Texas.

Mangino noticed that the rear license plate was a cardboard temporary plate apparently issued in Texas, which also seemed to have been tampered with. After an unsuccessful attempt to check the vehicle's registration with the New Castle Police Department, Mangino requested police assistance.

Officer Ronald Williams soon arrived at the scene, parking his car directly behind Elias's, so that Elias's car was sandwiched between the two other cars and could not be moved. After Mangino explained the situation to him, Williams began questioning Elias about the license irregularities. He thereafter discovered that the temporary Texas license plate covered a permanent license plate issued in California which had expired. At some point during this time Elias asked to be allowed to leave; his request was denied because the car had not yet been cleared. Williams did allow Elias to get out of the car, but warned him to keep his hands in plain view and not to make any sudden movements.

When Elias opened the car door, the car's internal light came on, and Williams noticed that a briefcase and a "scale case" were in the back seat. Williams recognized the scale case as the type which normally contains a scale used in the sale of drugs. Williams then asked Elias if he could search the car, and Elias consented. Before a search had begun, apparently, Elias pulled the briefcase out of the car, placed it on the roof, and quickly opened and closed it in order to show Williams that it contained no weapons. While the briefcase was open, however, Williams had noticed a large sum of money in one compartment, and a brown paper bag in another. The bag contained smaller clear plastic bags, which in turn appeared to contain a white powdery substance. Williams then asked Elias what was in the bag, and Elias responded: "That's my personal coke." At this point Elias had not yet been informed of his rights under *Miranda*.

Upon Elias's statement, Williams placed Elias under arrest and read him the *Miranda* warnings. Williams then asked Elias to unlock and reopen the briefcase, and then called the police department for assistance. Another officer arrived, and drove Elias to the police station. Williams stayed behind, and with the help of other officers searched the rest of the vehicle. More cocaine was found in a duffel bag behind the driver's seat; the total amount of cocaine found in the car was close to two pounds, and over $16,000 in cash was also found.

At a pretrial hearing, Elias sought to suppress the evidence of the cocaine and the case as well as his inculpatory statement. The District Court held that there had been no illegal search or seizure, and refused to suppress the evidence. With regard to the statement, the court denied suppression solely on the grounds that Elias had made a "spontaneous utterance." The record of the hearing shows that the court repeatedly characterized the statement as spontaneous, and at one point asserted that it "was not elicited by questioning." Appendix at 332. When defense counsel stated its position that Elias had been subjected to custodial interrogation for purposes of *Miranda*, the court responded:

I say it was not a custodial interrogation because it was an uninvited spontaneous utterance.

Now, those are the critical words, "Uninvited spontaneous utterance."

.    .    .    .    .

And, therefore, I refuse to suppress that statement.

Appendix at 333.

After suppression had been denied, Elias decided to enter a conditional guilty plea, reserving his right to appeal the District Court's decision at the hearing. Elias was convicted and sentenced to a prison term of ten years. It was made clear to Elias at the plea colloquy that if the District Court's decision regarding suppression is not affirmed, the conviction will be vacated and the Government will have the option of retrying him.

## II.   DISCUSSION

We find no basis for disturbing the District Court's denial of the motion to sup-

press the physical evidence. We agree with the court that every step leading up to the seizure of the evidence represented an appropriate response by the police to a rapidly developing situation. To the extent that the District Court denied suppression of the physical evidence, we find no error.

With respect to the statement, however, we cannot ignore the clear error in the finding that Elias's words were an "uninvited spontaneous utterance." At oral argument before this court, the Government conceded that the basis of the District Court's holding was clearly erroneous, and further conceded that such an error could not be considered harmless given the procedural posture of the case. Instead, the Government urged this court to affirm on other grounds, but did not specify what those grounds should be.

In order for this court to affirm the denial of suppression, we would have to determine that Elias's statement was not the product of custodial interrogation. We must first acknowledge that the statement was clearly made in response to interrogation, which the Supreme Court has defined as "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

The remaining issue is thus whether, at the time of his statement, Elias was in police custody for purposes of *Miranda*. Because the District Court made no finding of fact on this issue, we can only affirm if the record presented on appeal shows that any finding that Elias was not in custody would be a clear error. *See United States v. Mahar*, 801 F.2d 1477 (6th Cir.1986). Since the record shows inconsistent testimony regarding the level of coercive pressure to which Elias was subjected by Officer Williams and Constable Mangino, we cannot make such a determination and must remand to the District Court for further factual findings on that issue.

Nor can we say as a matter of law that Elias could not have been in custody for purposes of *Miranda* simply because his detention began as a routine traffic stop. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that traffic stops, despite the restrictions placed on the detainee's movements, do not constitute "custody" for purposes of *Miranda*, and are closer in kind to a *Terry* stop. Thus, in the normal traffic stop, statements elicited by interrogation are admissible as evidence even if made by a suspect who had not been read the *Miranda* warnings. However, the Court in *McCarty* refused to rule out the possibility that a *Terry*-like traffic stop could mature into a more serious detention which would have to be considered custodial:

> If a motorist who has been detained pursuant to a traffic stop thereafter is subject to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*.

468 U.S. at 440, 104 S.Ct. at 3150.

The Court acknowledged that this approach would cause the lower courts "occasionally to have difficulty deciding exactly when a suspect has been taken into custody," but preferred this result to the drawbacks of a more easily administered rule. *Id.* at 441, 104 S.Ct. at 3151. As a measure of guidance for the lower courts, the Court stated that the relevant question to ask in considering whether a detention has matured into custody is "how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. at 3151. And while the Court did not give any further explicit guidance for making such a determination, it did note the characteristics of a routine traffic stop that render it a less coercive environment than the custody which triggers an individual's rights under *Miranda*. Specifically, the Court noted that a routine traffic stop is presumptively temporary and relatively brief, that it takes place in public view, and that because it usually involves no more than two policemen, the context is not "police dominated." *Id.* at 437–38, 104 S.Ct. at 3148–49.

Given the record of the suppression hearing, it is impossible for this court to determine how a reasonable man in Elias's position would have understood his situation. There are too many inconsistencies in the testimony for us to know exactly how Officer Williams treated Elias in the moments leading up to Elias's statement, and our understanding of the situation is at best conjectural. As another Court of Appeals has written in a case very similar to the present one, "[i]n an extremely close case such as this, with a record that admits of conflicting interpretations, a court of appeals is ill-equipped to undertake its own de novo assessments of the facts against the proper standard." *United States v. Streifel*, 781 F.2d 953, 962 (1st Cir.1986).[1]

Since this court is incompetent to determine from the record on appeal whether Elias was in custody for purposes of *Miranda* at the time of his statement, we must remand that question to the district court for further findings of fact in light of the decision in *McCarty*. We will therefore vacate the judgment of conviction, affirm in part and reverse in part the denial of the motion for suppression, and remand for further consideration consistent with this opinion.

---

**1.** The history of the *Streifel* case is illustrative of the problems facing both appellate courts and district courts to which cases such as this are remanded. The Court of Appeals for the First Circuit, finding that the defendant's detention had begun as a permissible *Terry*-like traffic stop, remanded to the district court the question of whether the stop had matured into custody. In doing so, the court listed several factors to consider, such as the familiarity of the surroundings and the fact that the policemen involved had used their cars to block any movement of the defendant's car. On remand, however, the district court did not hold further hearings or examine new evidence; instead, it simply reviewed the record of the original suppression hearing, and held that the defendant had been in police custody. *United States v. Quinn*, 633 F.Supp. 535 (D.Me.1986) (Streifel and Quinn were co-defendants). The Court of Appeals then decided that the District Court had incorrectly decided the issue of custody on remand, and reversed, thus substituting its own reading of the record for that of the District Court despite its earlier reluctance to do so.