STATE of Maine

v.

Philip LAVOIE.

Supreme Judicial Court of Maine.

Argued May 12, 1989.

Decided July 14, 1989.

James E. Tierney, Atty. Gen., James T. Kilbreth (orally), Chief Deputy Atty. Gen., Wayen S. Moss, Asst. Atty. Gen., Augusta, for the State.

Neale A. Duffett (orally), Cloutier, Barrett, Cloutier & Conley, Portland, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN,

CLIFFORD, HORNBY and COLLINS, JJ.

WATHEN, Justice.

The State appeals from an order of the Superior Court (Cumberland County, *Brennan, J.*) granting defendant's motion to suppress all post-arrest statements made by defendant during the course of a murder investigation. The Superior Court found that defendant had twice "clearly and unequivocally invoked his right to remain silent" before his arrest and that police officers had failed to scrupulously honor his decision to remain silent by questioning him after his arrest. The State argues on appeal that in suppressing defendant's post-arrest statements, the Superior Court incorrectly applied the principles of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). We agree and vacate the suppression order.

I.

The facts developed at the suppression hearing may be summarized as follows: On February 14, 1988, at approximately 10:25 a.m., the Portland Police Department received a call from a male stating that there was a dead female at 210 Valley Street in Portland. Twenty minutes later the police received a second call from a male who identified himself as the individual who had called twenty or thirty minutes earlier to report a murder. At approximately 12:18 p.m., Detective Kelly of the Portland Police Department investigated the scene of the alleged homicide. He noticed that the names on the mailbox were L. Selby and P. Lavoie. While at the scene, an individual who came to the apartment informed him that Linda Selby and Philip Lavoie had occupied the apartment. Detective Kelly discovered the body of the alleged victim, who was later identified as Linda Selby, in the bedroom. The cause of death appeared to be strangulation.

At approximately 5:50 p.m. Sergeant Pike of the Portland Police Department received a call from the dispatcher who told

him that he had a person named Philip on the line, that Philip stated that he had killed his girlfriend, and that he was at Anania's Store on outer Congress Street in Portland. Sergeant Pike told Detective Kelly to proceed to Anania's with Lieutenant Ross to try to locate the caller. Pike then spoke to the caller. The transcript of the telephone call reveals that the caller identified himself as the individual who had called earlier about the girl who had been killed. The caller also told Sergeant Pike that he had choked his girlfriend to death during a fight.

Meanwhile Detective Kelly and Lieutenant Ross proceeded to Anania's Market to look for the caller but found no one. They conducted a general search of the area and spotted defendant at the intersection of Park Avenue and Valley Street. Lieutenant Ross testified that he pulled up beside defendant, asked him if he was Philip Lavoie, and that defendant responded that he was. He told defendant that he was investigating a criminal matter regarding Linda Selby and asked him if he would accompany the officers to the police station to which defendant responded, "no." Lieutenant Ross then asked defendant if he would sit in the police car and talk to them and defendant again responded, "no." Defendant also stated "unless you're going to arrest me I am going to keep walking." Lieutenant Ross asked Detective Kelly to walk with defendant, got back in the car and drove along, keeping pace with defendant and Detective Kelly. He called police headquarters, asked for instructions, and was told to arrest defendant. He then told defendant he was under arrest and placed him in the back seat of the cruiser with Detective Kelly who advised defendant of. his *Miranda* rights. At that point, defendant made a statement regarding the homicide and admitted to having strangled the victim during an argument.

Detective Kelly confirmed defendant's refusal to speak to the officers. Detective Kelly added that as he accompanied defendant on foot, Lavoie spontaneously shouted at one point, "I really loved her." Detective Kelly estimated that only 2½ to 4 minutes transpired between defendant's re-

fusal to speak to the police and his arrest. He testified also that after the arrest he administered *Miranda* warnings to defendant and defendant indicated that he understood his rights and made a statement regarding the homicide. Detective Kelly testified that he and Sergeant Pike interviewed defendant at the police station at approximately 6:50 p.m. During that interview, defendant made a detailed statement regarding the events of the evening and confessed to having choked his girlfriend Linda Selby to death.

The Superior Court found as fact that, before his arrest, defendant twice "clearly and unequivocally" told police that he did not want to talk to them and that "[b]etween the time the police encountered [defendant] and his arrest, five minutes elapsed." The Superior Court concluded that defendant's arrest was based on probable cause and that the State had shown beyond a reasonable doubt that defendant "was physically, emotionally and intellectually capable of waiving his constitutional rights." The Superior Court, however, suppressed defendant's statements on the sole ground that the police officers failed to scrupulously honor defendant's rights by administering *Miranda* warnings and questioning him immediately after he had twice "clearly and unequivocally asserted his right to remain silent ...."

## II.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that in order to use statements obtained from *"custodial* interrogation," the prosecution must "demonstrate[ ] the use of procedural safeguards [the *Miranda* warnings] effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. at 1612. The Supreme Court also explained that law enforcement officials must respect a defendant's decision to assert his rights.

If the individual indicates in any manner, at anytime prior to or during questioning, that he wishes to remain silent, the interrogation must cease. ... If the individual states that he wants an attorney,

the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.

*Id.* at 473–74, 86 S.Ct. at 1627–28.

Similarly, in *Michigan v. Mosley*, 423 U.S. 96, 98, 96 S.Ct. 321, 323–24, 46 L.Ed.2d 313 (1975), the Supreme Court elaborated upon the right of an individual to cut off questioning by invoking his right to remain silent during custodial interrogation.

In both *Miranda* and *Mosley*, all questioning was in the nature of *custodial* interrogation. In the present case, the Superior Court apparently assumed, but did not explicitly find, that defendant was not in custody when he twice asserted his right to remain silent in response to police inquiry immediately prior to his arrest. We have applied the test set forth by the First Circuit in *United States v. Streifel*, 781 F.2d 953 (1st Cir.1986) for determining whether custody exists. *See State v. Bridges*, 530 A.2d 718, 719 (Me.1987); *State v. Gardner*, 509 A.2d 1160, 1163 (Me.1986). In *Streifel*, the First Circuit set forth the following criteria for analyzing the custody issue:

> [I]n a non-stationhouse setting, *Miranda* is *not* triggered simply because a person detained by the police has reasonable cause to believe that he is not free to leave. Rather, a host of factors must be considered in order to determine whether the 'suspect's freedom of action is curtailed *to a degree* associated with formal arrest.' In making this determination, the court must decide whether the stop 'exerts upon [the] detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'

*United States v. Streifel*, 781 F.2d at 961 (construing and quoting *Berkemer v. McCarty*, 468 U.S. 420, 437, 440, 104 S.Ct. 3138, 3148, 3150, 82 L.Ed.2d 317 (1984)) (citations omitted).

In *Berkemer*, the Supreme Court held, *inter alia*, that the roadside questioning of a detained motorist during a routine traffic stop does not constitute custodial interrogation. The Court recognized that a traffic stop does significantly curtail the freedom of action of driver and passengers, *id.* at 436, 3148, but noted that "[t]wo features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" *Berkemer v. McCarty*, 468 U.S. at 437, 104 S.Ct. at 3149 (quoting *Miranda v. Arizona*, 384 U.S. at 467, 86 S.Ct. at 1624). First, traffic stops are "presumptively temporary and brief" and the detainee has the expectation, in contrast to the detainee in station-house interrogation, that he soon "will be allowed to continue on his way." *Id.* at 437, 104 S.Ct. at 3149.

Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability.

*Id.*

■ When we apply the criteria set forth in *Berkemer* and adopted in *Streifel* to the facts of the present case, we conclude that the Superior Court correctly assumed that defendant was not in custody during the five minute period between his encounter with the police and his arrest. The fact

that defendant continued to walk in the direction he chose, albeit accompanied by a police officer on foot and another in a cruiser, supports the finding that his "freedom of action [was not] curtailed to a degree associated with formal arrest." Notwithstanding the "aura of authority" surrounding the police officers, it is apparent that defendant did not feel pressure sufficient to "impair his free exercise of his privilege against self incrimination." When asked to speak to the police officers, defendant responded, "unless you are going to arrest me I am going to keep walking." Moreover, the fact that the encounter took place in public, on Park Avenue, a relatively busy city street, between 6:00 p.m. and 7:00 p.m., at a busy time of day, also supports the finding that defendant was not in custody.

■ The Supreme Court has not yet addressed the precise question whether a pre-custodial assertion of the right to remain silent precludes law enforcement agents from further·interrogating a criminal defendant once he has been taken into custody. Our interpretation of the rationale underlying *Miranda* and its progeny persuades us, however, that no such prohibition exists. In *Miranda v. Arizona*, 384 U.S. at 458, 86 S.Ct. at 1619, the Court perceived "an intimate connection between the privilege against self-incrimination and police *custodial* questioning" and held that "adequate protective devices" designed to "dispel the compulsion inherent in *custodial* surroundings" must be employed to ensure that any statement obtained from a defendant is "the product of his free choice." *Id.* (emphasis supplied). The Court tied both the requirement that warnings be administered, *id.* at 467–69, 86 S.Ct. at 1624–25, and the requirement that the defendant be permitted to cut off questioning to the inherently coercive atmosphere of custodial interrogation. "Without the right to cut off questioning, the setting of *in custody* interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." *Id.* at 474, 86 S.Ct. at 1628 (emphasis supplied). The Court later reiterated this view in *Michigan v. Mosley*, 423 U.S. at 103–104, 96 S.Ct. at 327.

"Through the exercise of his option to terminate questioning [the person in custody] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the *custodial* setting." (emphasis supplied).

Moreover, the Court has explicitly held that law enforcement officials need not administer *Miranda* warnings if the interrogation is non-custodial in nature. In *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), for example, the Court rejected the argument of the defendant that *Miranda* warnings must precede interrogation of an individual who has become the focus of a criminal investigation but who is not in custody. The Court stated as follows:

> [Defendant's argument] goes far beyond the reasons for [the *Miranda* holding] and such an extension of the *Miranda* requirements would cut this Court's holding in that case completely loose from its own explicitly stated rationale. The narrow issue before the court in *Miranda* was presented very precisely in the opening paragraph of that opinion—"the admissibility of statements obtained from an individual who is subjected to *custodial* police interrogation."

*Id.* at 345, 96 S.Ct. at 1615 (quoting *Miranda v. Arizona*, 384 U.S. at 439, 86 S.Ct. at 1609) (emphasis in *Beckwith*). *See also Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). ("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.") (emphasis supplied).

In this case, we conclude that the police officers did not violate the protection afforded by *Miranda* by subjecting defendant to interrogation after his arrest, notwithstanding his pre-arrest refusal to speak to them. The Supreme Court has

stated that *"[a]ll Miranda's* safeguards, which are designed to avoid the coercive atmosphere, rest on the overbearing compulsion which the court thought was caused by isolation of a suspect in police *custody." United States v. Washington,* 431 U.S. 181, 187 n. 5, 97 S.Ct. 1814, 1819 n. 5, 52 L.Ed.2d 238 (1977) (emphasis supplied). The protection afforded by *Miranda* is confined to the custodial setting. Our analysis is further strengthened by a Seventh Circuit decision expressly holding that the right to cut off questioning applies only if the defendant is in custody. In *United States v. Serlin,* 707 F.2d 953 (7th Cir.1983), Internal Revenue Service agents questioned defendant over a period of more than a year regarding an alleged violation of the federal income tax laws. At one point, the defendant informed the agents that he did not wish to cooperate. The IRS agents continued to question defendant on subsequent occasions and apparently obtained a number of statements from him.

The defendant argued that *Mosley* required that the agents "cease all questioning" once he had expressed reluctance at cooperating with them. The Court of Appeals rejected the defendant's argument noting that the Supreme Court's concern in both *Miranda* and *Mosley* was the "coercive atmosphere created by custodial interrogation." *Id.* at 957.

The entry is:

Suppression order vacated.

Remanded for further proceedings consistent with the opinion herein.

All concurring.