STATE OF MAINE

KNOX, ss.

STATE OF MAINE
Knox. S.S., Clerks Office
SUPERIOR COURT
JAN 12 2001
RECEIVED AND FILED
Susan Gillette, Clerk

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-99-428
JRA -KNO- 1/12/2001

STATE OF MAINE

v.

MALCOLM H. EMERY,

      Defendant

DECISION AND ORDER
ON MOTION TO SUPPRESS

This matter is before the court on the defendant's motion to suppress statements he made to a police officer, Det. Sgt. William Donnelly of the Rockland Police Department. The State opposes the motion, so a testimonial hearing was conducted and post-hearing memoranda have been submitted. The motion is therefore in order for disposition.

Det. Donnelly interviewed the defendant seven times about a suspected arson of an unoccupied dwelling which had occurred near the defendant's home in the early morning of September 24, 1999. The defendant seeks to suppress the content of all these statements arguing that they were either involuntarily made or that, in two instances, the statements were elicited in violation of *Miranda* requirements.

For purposes of the analysis to be applied to these seven interviews, they can be assigned to three factual categories: one interview at the fire scene, four later interviews before the arrest, and two custodial interviews at the Knox County Jail.

When a defendant makes a claim asserting his statements to the police were involuntary, it is the State's burden to establish the contrary beyond a reasonable

doubt before the challenged statements may be admitted as evidence at trial. *State v. Cole*, 1997 ME 112 ,¶ 6, 695 A.2d 1180, 1182.

Addressing the interview at the fire scene first, it is clear that nothing about the circumstances of this conversation between Det. Donnelly and the defendant suggest either a custodial situation or that the statements the defendant made were involuntary. This conversation was brief, informal and friendly. Indeed, it appears that the defendant was interviewed by Det. Donnelly on this occasion, not because he was a suspect, but because he was a potential witness to the fire who lived next door and had called the public safety authorities to respond. That the interview was conducted in Det. Donnelly's police cruiser is of little import. The interview occurred in the early morning at the fire scene and few other places for private conversation were likely available. No reasonable person in this circumstance would have believed himself to be in police custody or in any way constrained by the officer. *State v. Powell*, 640 A.2d 609, 610 (Me. 1994).

The next four interviews occurred later on the same day and on October 18, 20 and 28, 1999. These require a somewhat different analysis in that they were more formalized exchanges of somewhat longer duration. However, as the defendant apparently concedes, none of these interrogations were custodial. That is to say, as noted *infra*, a reasonable person in the defendant's position would not have believed he was in police custody on these four occasions, "and constrained to a degree associated with formal arrest." *Powell, id*. As such, it was not necessary for Det. Donnelly to have provided the defendant with the *Miranda* warnings or to

2

have secured from him a waiver of his Fifth and Sixth Amendment rights. *State v. Carr*, 1997 ME 221, ¶ 10, 704 A.2d 353, 356.

Nevertheless, the defendant claims his statements during these interviews were not voluntarily provided because Det. Donnelly induced them by misleading the defendant about his rights. The transcripts of the interviews on these occasions, however, show that Det. Donnelly never misled the defendant about his right to remain silent or to have the assistance of counsel during the interviews. Indeed, not only were these topics not discussed, the defendant demonstrated an awareness that his conversations with Det. Donnelly entailed the risk of self-incrimination. State's Exhibit 4, p.1. Instead, Det. Donnelly throughout these conversations promoted the theory, which he apparently did not believe to be true, that the fire was probably an accident, that the defendant started it inadvertently, and that he therefore could not or would not be charged with an accidental fire.[1] The transcripts and the testimony at hearing do not specifically address why Det. Donnelly took this approach, but it is fair to infer that he did so as a tactic designed to have the defendant acknowledge some role in the fire. The tactic was a success, and the defendant on three of these occasions orally or in writing acknowledged that he may have started the fire accidentally by throwing a cigarette at the house while he was intoxicated.

---

[1] The transcript of the seventh interview, State's Exhibit 8, p. 17, makes it plain that Det. Donnelly believed that the defendant intentionally set the fire.

3

The defendant argues that this deceptive approach violated his due process rights in that the statements were elicited from him contrary to the government's responsibility to act with "fundamental fairness" because it engaged in conduct which "offend[ed] the community's sense of justice, decency and fair play." *State v. Stade*, 683 A.2d 164, 166 (Me. 1996). In support of this argument, he cites the court to the case of *State v. McConkie*, 2000 ME 158, ¶¶ 9-10, _____ A.2d _____ in which our Law Court reversed the decision of a trial court which had denied a motion to suppress a statement given to an officer after the officer had assured the suspect that the "interview would stay confidential." *Id.* ¶ 4. Under such circumstances, the court held, it was a denial of due process to have affirmatively misled the suspect to believe the exact opposite of what was true about his right to remain silent and not incriminate himself, namely that his statement would not be used against him because it was confidential.

While the defendant in the case at bar may have been misled by the detective as to the latter's beliefs about the nature of the fire and the former's role in it, the defendant was always correctly told that if the fire were accidentally set there was no crime, that arson required an intentional act,[2] and that if all the defendant did was carelessly toss a cigarette at a house with no intent to damage or burn it, he could not be successfully charged with arson. Indeed, the fact that the defendant has admitted to Det. Donnelly that he may have started the fire in question by accident advances the prosecution's cause only modestly, absent other evidence that he

---

[2] Arson requires proof of intentional conduct. *State v. Barrett*, 408 A.2d 1273, 1276 (Me. 1979).

4

started the fire intentionally. Importantly, then, unlike the facts in *McConkie, id.,* this defendant was not misled in these interviews about either his constitutional rights or the law.

Moreover, all of these conversations took place in noncustodial circumstances in a cooperative, non-confrontational atmosphere. During these conversations, the defendant was, as noted, alert to the risk of self-incrimination. That he accepted, unwisely perhaps, the detective's entreaties about the possibility that he set the fire accidentally, does not render his statements inadmissible. That is because if a statement were made unwisely, or based on illogical reasoning, or in the mistaken belief it might assist one's situation, the law will not by virtue of such miscalculations exclude such a statement as involuntary. *State v. Hutchinson,* 597 A.2d 1344, 1346 (Me. 1991).

From all of the evidence, it must therefore be concluded that the State has established beyond a reasonable doubt that any written or oral statements the defendant made to Det. Donnelly on September 24, October 18, 20 and 28, 1999, were the product of the free choice of a rational mind and not the result of coercive or unfair police conduct; as such they are voluntary and admissible in evidence. *State v. Smith,* 615 A.2d 1162, 1163 (Me 1992).[3] Accordingly, the motion is to be denied as to these statements.

---

[3] In his memorandum of law, the defendant also argues that he has limited intelligence and was susceptible to police suggestion. No admissible evidence was produced to support these assertions.

5

The sixth interview occurred at the Knox County Jail on October 29, 1999, after the defendant had been arrested. It was, therefore, a custodial interrogation. Recognizing this, Det. Donnelly advised the defendant of his Miranda warnings and, according to the transcript, the defendant waived his rights to remain silent and to counsel and agreed to speak with the detective. However, at the hearing on the motion, Det. Donnelly testified that the defendant told him he did not want to speak with him and that the detective had "enough in the warrant." "The defendant wasn't hostile, but he was very quiet. He didn't want to talk."[4]

Because the defendant exercised his right to remain silent at the October 29, 1999 interview, any statements he made during that interview cannot be used as evidence at trial because interrogation must cease after asserting this right. *Miranda v. Arizona*, 384 U.S. 436, 473-474; *State v. Lavoie*, 562 A.2d 146, 147-148 (Me. 1989).

Three days later, however, Det. Donnelly returned to the County Jail to conduct another interview with the defendant. Because the defendant was still in custody, Det. Donnelly read the *Miranda* warnings to the defendant and elicited a waiver of his rights to silence and to counsel. What transpired thereafter was a lengthy exchange in which the defendant made further statements in which he provided more details about how the fire was set, although still claiming it was an accident, despite the officer's new contention that he believed it was intentionally set.

---

[4] The court accepts as accurate Det. Donnelly's testimony as to this exchange instead of the transcript, State's Exhibit 7, as the latter contains a number of "inaudible" entries.

The defendant relies on the proposition that once a suspect invokes the right to remain silent and asks for an attorney, he may not thereafter be questioned unless he does so with the benefit of counsel or unless he initiates further communication. Absent those contingencies, he argues, any statements as the result of interrogation after asserting the right to silence are per se inadmissible. Defendant's Memorandum, p. 5.

The case at bar, however, does not entail the assertion of the right to counsel and the jurisprudence surrounding that circumstance. Instead, this case entails the assertion of the right to silence and the procedures to be followed thereafter if further interrogation is to be lawfully conducted.

The principles in assessing the propriety of a subsequent interrogation when the right to silence has been asserted are found at the seminal case of *Michigan v. Mosley*, 423 U.S. 96, 100-104, 96 S.Ct. 321, 324-327 (1975). In *Mosley*, the Supreme Court held that law enforcement officials are bound to respect a suspect's assertion of the right to silence as that obligation serves to counteract "the coercive pressures of custodial setting." *Id*. at 104. However, further questioning may be undertaken if the suspect's right to cut-off interrogation has been "scrupulously honored" as may be evaluated by a three-part test: (1) whether the police immediately cease the interrogation on the invocation of that right; (2) whether the police resume questioning only after the passage of a significant period of time and provide fresh *Miranda* warnings; and (3) whether the latter interrogation is restricted to matters

7

distinct from the former. *Id.* 105-107. *See also State v. Rossignol*, 627 A.2d 524, 527 (Me. 1993).

The first two parts of this test can be disposed of with the findings that Det. Donnelly did cease interrogation on October 29 immediately after the defendant refused to speak and that a significant period of time did elapse from then to the interview on November 1 at which event "fresh" *Miranda* warnings were provided.

The third test, which addresses the subject matter of the interrogation, has undergone an evolution since the *Mosley* decision in 1975. Now that test has been reformulated in a number of our federal circuit courts to be one which "depends not on its subject matter but rather on whether the police, in conducting the interview, sought to undermine the suspect's resolve to remain silent." *United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir. 1998) (citing cases from the 1st, 2nd, 4th, 8th, 9th and 11th circuits which have developed similar alternatives to the third prong of *Mosley* three-part test).[5] This new articulation of the third prong of the *Mosley* test has been expressed slightly differently as a question of whether or not the police repeated efforts "to wear down petitioner's resistance or to induce him to abandon his earlier assertion of his right to remain silent." *United States v. Brown*, 186 F.3d 1011, 1015 (8th Cir. 1999).[6]

---

[5] The First Circuit case is *United States v. Andrade*, 135 F.3d 104 (1st Cir. 1998). It does not specifically articulate a new third part of the *Mosley* inquiry, but appears to substitute a new factor of whether or not the suspect was pressured to give a statement instead of the traditional test of whether or not the police inquiry was as to a new crime. *Id.* p. 107.

[6] Obviously, if the original third prong of the *Mosley* test were applied to the facts in this case, the statement would have to be suppressed as the November 1 interview was not concerned with matters distinct from the October 29 interview.

8

Applying the third *Mosley* test as restated in either *Schwensow*, *id.*, or *Brown*, *id.*, it must be concluded that, in the entire context of this interview, Det. Donnelly attempted to undermine the defendant's decision to remain silent or to induce him to abandon the exercise of this right. Support for this conclusion may be found throughout the transcript of this interview, State's Exhibit 8, in which Det. Donnelly assured the defendant that further conversation could only help him, and that it was the way to get help for a problem with fire-setting or alcohol abuse. Not only is there reason to doubt these entreaties as genuine, most telling as to these exchanges is the first several minutes of conversation between these two men.

The conversation starts with talk about the seriousness of the defendant's situation (several prior convictions for arson), his family's concern for him, and his mother's poor health, after which Det. Donnelly tells the defendant he wants to talk to him and read him his rights, that if he decides not to talk, that would be fine, but, "<u>You won't have another chance</u> . . . I'll read you your rights again." At which juncture the defendant asks, "This is to help me out, right?" To which the detective replied, "<u>It's only going to help you out</u>. I mean, you, you, have to help yourself, Mackie. It's the right thing to do." State's Exhibit 8, p. 2. (emphasis supplied).

First, it should be noted that what the detective told the defendant wasn't true. If he wanted to make a subsequent statement, he could do so; this was not his final chance.[7] Next, after the defendant attempted to satisfy himself that talking to the officer was for the purpose of helping himself, the officer assured him it was the

---

[7] Obviously, a defendant can give a statement as to a crime whenever he chooses.

9

only purpose of their talking. However, the primary purpose of the officer was plainly to further interrogate him about the fire, as the transcript shows repeated arguments made to the defendant that his earlier claims of accident were not believable, that the evidence showed, and the detective believed, that the fire was intentionally set, and that the defendant ought to acknowledge his responsibility for this crime. Obviously, the officer's "only" purpose was not to help the defendant but to secure a confession -- a circumstance contrary to his interests, particularly where he had prior arson convictions. There was also little the detective could, in fact, do to help him, other than tell the prosecutor that the defendant cooperated, as opposed to holding out hope for him that acknowledging responsibility for the fire would result in counseling for fire-setting or alcohol abuse.

Thus, the defendant was misled as to the purpose of the detective's visit, the interest to be served by waiving his rights, and the need to give a statement only then, as opposed to a later time when he could freely elect to do so, perhaps after conferring with an attorney. From all this, it must be determined that the State has not met its burden of proof by a preponderance, *State v. Snow*, 513 A.2d 274, 276 (Me. 1986), that Det. Donnelly "scrupulously honored" the defendant's previously exercised right to remain silent, but instead "sought to undermine [his] resolve to remain silent" or "induce him to abandon his earlier assertion of his right to remain silent." *Schwensow, id.; Brown; id.*, by securing an inculpatory statement from him contrary to his constitutional rights.

10

Accordingly, the motion must be granted as to the interviews which occurred on October 29 and November 1, 1999, and the entry will be:

Motion to Suppress DENIED IN PART and GRANTED IN PART.

So ordered.

Dated: January _11_, 2001

John R. Atwood
Justice, Superior Court

STATE'S ATTORNEY:
Eric Walker, Esq.
Knox County Courthouse
62 Union Street
Rockland, ME 04841-2836

DEFENDANT'S ATTORNEY:
William Maddox, Esq.
P.O. Box 1202
Rockland, ME 04841

11

STATE OF MAINE

KNOX, ss.

STATE OF MAINE
Knox. S.S., Clerks Office
SUPERIOR COURT
APR 26 2001
RECEIVED AND FILED
Susan Guillette, Clerk



SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-99-428
JRA - KNO - 4/26/2001

STATE OF MAINE

v.

MALCOLM H. EMERY,

        Defendant

**DECISION AND ORDER**

This matter is before the court on the defendant's "Motion for Late Filing Motion to Suppress . . ." This motion was granted orally on April 9, 2001, and the court then proceeded to hear testimony in support of a second motion to suppress the defendant's statements, the first such motion having been disposed of on January 11, 2001.

While no written motion was filed, it is the court's understanding from the defendant's post-hearing memorandum that he claims his statements were involuntarily given. In response to such a claim, the State is required to establish that a suspect's statements were voluntary beyond a reasonable doubt. *State v. Collins*, 297 A.2d 620, 627 (Me. 1972).

The defendant, in an effort to support a finding that reasonable doubt exists as to the voluntariness of the defendant's statements, presented the testimony of Dr. Diane Schetky, a psychiatrist with expertise in forensic matters.

Dr. Schetky testified that because of the defendant's borderline I.Q. and his experience of being intimidated as a child, he was susceptible to police suggestion

1

and, in a submissive or passive way, yielded to his interrogator's suggestive questioning and confessed. That being so, it is posited, his statements were provided involuntarily.

Under Maine law, as noted, the State must establish beyond a reasonable doubt that an accused's statement is ". . . the result of [his] own free will and rational intellect." *State v. Caouette*, 446 A.2d 1120, 1123 (Me. 1982). Said differently, a suspect's statement will be excluded unless he has chosen, "freely and knowingly, to provide criminal self-condemnation by utterances from his own lips." *Collins, id.* at 626.

In the court's view, the State has met this burden of proof when the totality of the evidence in both motion hearings is considered, Dr. Schetky's postulations notwithstanding.

In the five interviews that occurred before the defendant was arrested, the circumstances were amicable and there is no indication that Det. Donnelly exploited the defendant's reduced intellect. Importantly, as noted in the January 11 order, and contrary to Dr. Schetky's theory, the defendant was cautious in his dealings with Det. Donnelly that he say nothing incriminating. Indeed, throughout these interviews he never explicitly incriminated himself, despite Det. Donnelly's various entreaties which occurred over several weeks. Not only does this circumstance effectively rebut the contention that he passively submitted to the officer's suggestions, his protest of his treatment "on the street" by other officers demonstrates that he did not and would not surrender to intimidation. Most

2

persuasive in this regard is the defendant's assertion of his rights once he was arrested; were he the passive, suggestible subject characterized in the testimony at the second hearing, one would expect him to again yield to Det. Donnelly's earnest petitions at the county jail. He did not and exercised his right to silence in the face of this appeal.

That Det. Donnelly may have misled the defendant about his beliefs as to the latter's role in the fire does not change this analysis. As noted, the defendant was on guard against incriminating himself and only acknowledged those acts which, on their face, would amount to accidental activity. Again, were he the defenseless subject of police trickery who cannot hold his own in an argument, one would have expected him not to argue with Det. Donnelly as he did, and to eventually capitulate to his interrogations. This never happened; indeed, as noted, Det. Donnelly never was successful in eliciting a confession from the defendant.

From all of this, then, the court concludes that Dr. Schetky's testimony does not alter the conclusion that the State has established that the defendant's statements to Det. Donnelly before he was arrested were voluntarily made as a result of the "exercise of his own free will and rational intellect." *Caouette, id.* All this being so, the motion must be denied and the conclusions which the defendant suggests in his post-hearing memorandum must be rejected as without persuasive support in the record.

Accordingly, the entry will be:

Second Motion to Suppress is DENIED.

So ordered.

Dated: April 26, 2001

John R. Atwood
Justice, Superior Court

**State's Attorney:**
Eric Walker, Esq.
Knox County Courthouse
62 Union Street
Rockland, ME 04841-2836

**Defendant's Attorney:**
William Maddox, Esq.
PO Box 1202
Rockland, ME 04841-1202

4