STATE OF MAINE

KNOX, ss.

STATE OF MAINE

v.

ROBERT H. JUDECKI,

Defendant

STATE OF MAINE
Knox, ss., Clerk Office
SUPERIOR COURT

APR 2 3 2004

RECEIVED AND FILED
Susan Guillette, Clerk

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-03-533
JRA -KNO- 4/3 2/2004

DECISION AND ORDER

DONALD L.
LAW LIBRARY

MAY 25 2004

Pending before the court are two motions to suppress. The first of these asks to exclude as evidence any statements the defendant made to Rockland police officers because they were elicited while the defendant was in custody and had not been provided with *Miranda* warnings. The defendant also asserts that his statements were involuntary.

The second motion claims that there was no articulable suspicion to stop the automobile the defendant occupied, that there was no probable cause to arrest him, and no probable cause to search the vehicle. Accordingly, the defendant asks that any tangible evidence seized under these claimed circumstances be suppressed.

I. Facts.

After reviewing the court's notes and the parties' memoranda, the court makes the following findings of fact.

At about midnight on April 3, 2003, Officer Nellie Waterman of the Rockland Police Department was on patrol in that city. As she drove northbound on Camden Street, also known as U.S. Route One, she observed a vehicle approaching her in the vicinity of the Wal-Mart store with its high beams on. This part of Camden Street is divided into three lanes – one northbound, and two southbound with the center southbound lane designed for left-turning traffic. As this vehicle approached Officer

Waterman, she observed it on the line separating her travel lane with the southbound lane for left-turning vehicles. As a result, she altered her course to avoid this vehicle and turned around so she could follow it. She caught up with this vehicle and followed it southbound on Camden Street where she observed it drifting somewhat in its lane of travel, its left tires touching the lane dividing line at least once. She continued to follow the vehicle, a pick-up truck, after it turned on to Maverick Street and then pulled it over at an EBS parking lot. According to Officer Wellman, the truck was never speeding and never interfered with other traffic. Nevertheless, she believed she should stop the vehicle because the driver might be impaired.

After the two vehicles stopped in the EBS lot, they were joined by another car and, later, a second police car. Officer Wellman approached the truck and recognized the operator, Timothy Tolman, whom she called "Casey." She also recognized the passenger, Robert Judecki, the defendant in this case. While there she learned that Tolman's license was under suspension and could smell the odor of alcohol inside the vehicle, although she could not determine its source.

Tolman denied drinking, but was arrested for Operating After Suspension, handcuffed and placed in Officer Waterman's police cruiser. He also told Waterman that his companion, the defendant, had been drinking so that he was asked to drive the truck. She then returned to the truck where the defendant had been seated in the passenger seat during this transaction. Officer Waterman asked Judecki if he had been drinking and, then, asked him to step out of the truck, advising him she would be searching the vehicle incident to the arrest of Tolman. Judecki, the owner of the vehicle, indicated he had "no problem" with that, and complied with the officer's direction to get out of the truck.

Officer Waterman then searched the cab of the pick-up truck where she found a mesh Leatherman case in the glove box. Inside this case she found a clear plastic patch known as a fentanyl patch which contains opiates, a scheduled W drug which is illegal to possess without a prescription.

She then approached the defendant who was upset and crying, apparently because he was underage and had been caught with signs of alcohol consumption, and had been asked about his drinking. He also expressed fear of going to jail. Indeed, Officer Waterman noticed that the defendant had blood shot eyes and slow reactions and, as a consequence of these observations, believed that the defendant was somewhat impaired.

She asked him if the pouch was his and then opened it and showed the defendant the patch inside, asking him if he knew what it was. The defendant acknowledged that the pouch was his but denied knowing what the patch was. After Waterman said, "I know better than that; if the pouch is yours what is the patch doing there?", he acknowledged that the patch was his but that he did not realize it was still in his truck. Again, Officer Waterman asked Judecki about his drinking that night.

During this conversation, Officer Waterman told the defendant he was not going to be summonsed for the underage drinking and would not be arrested for possession of the patch so that he should not fear being taken to jail. She did ask him, however, if he had a prescription for the patch and, after Judecki said he did not have it with him, she told him to bring it to the police department.

During these events at the EBS parking lot, there was one other police cruiser present and a total of three police officers. Also present were Desiree Capizzano and Nikki Frank, friends of the defendant, who had been following Judecki's truck in their own vehicle. Later, Ms. Frank ended up driving the defendant home in his truck.

The defendant was never advised of his *Miranda* rights and testified that he did not feel free to leave the scene, that he was in trouble, and that he would be taken to jail after Officer Waterman found the patch. He agreed, however, that Officer Waterman told him he would not be arrested for the alcohol violation and was ultimately told he would not be arrested for possession of the patch.

On April 24, 2003, Officer Waterman came upon the defendant at a local convenience store and asked him for the prescription for the patch and that she would have to charge him if he did not produce it. In response, the defendant told her he did not have a prescription.

## II.   Discussion.

Law enforcement officers are authorized in executing a vehicle stop if "at the time of the stop:  (1) [the officer] has an "articulable suspicion' of criminal activity; and (2) such suspicion is 'objectively reasonable in the totality of the circumstances.'" *State v. Lear*, 1998 ME 273, ¶ 5, 722 A.2d 1266, 1267 (quoting *State v. Brown*, 1997 ME 90, ¶ 5, 694 A.2d 453, 455). An articulable suspicion that a civil violation has been committed suffices to meet this test. *State v. Connors*, 1999 ME 125, ¶ 7, 734 A.2d 195, 197.

In the court's view, Officer Waterman, in observing a vehicle approach her which did not dim its headlights, had an articulable suspicion to believe that its operator committed a civil violation. 29-A M.R.S.A. § 2067(2). More importantly, that this vehicle failed to dim its lights, crossed a dividing line once and drifted in its travel lane twice thereafter late at night provided the officer with articulable suspicion to believe that its operator was impaired and her suspicion that this may be the case is objectively reasonable. Accordingly, the court concludes that the stop of the defendant's truck was lawful.

Once the vehicle was stopped, the officer was uncontestably authorized to ask its driver for his license. Upon learning that Tolman's license was under suspension, Officer Waterman had probable cause and the authority to arrest him without a warrant for the class E crime of Operating While License is Suspended or Revoked. 29-A M.R.S.A. § 2412-A(1); 17-A M.R.S.A. § 15(1)(B).

The search of the passenger area of a lawfully stopped motor vehicle when an occupant has been arrested does not violate either the federal constitution or ours, *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864 (1981); *State v. LaPlante*, 534 A.2d 959, 963 (Me. 1987), even when the occupants are outside the vehicle. *State v. LaPlante, id.* Thus, because Officer Waterman had articulable suspicion to stop the defendant's truck and, later, had probable cause to arrest its operator, she also had the authority to search the vehicle, and the fruits of that effort can be admitted in evidence without violating either the Maine or federal constitutions. Accordingly, the motion to suppress the evidence seized by Officer Waterman, the fentanyl patch, must be denied.

With reference to the motion to suppress the defendant's statements, it ought first to be observed that routine roadside inquiries by a police officer immediately following a traffic stop are considered noncustodial. *State v. LaVoie*, 562 A.2d 146, 148 (Me. 1989). So, Officer Waterman's first inquiry to the defendant concerning his drinking after the stop of his vehicle and while he sat in the passenger seat must be viewed as a noncustodial interrogation which does not require *Miranda* warnings.

Once the defendant got out of his truck at Officer Waterman's request, it may be argued that the questioning characteristic of a routine traffic stop was over. If so, the focus must be on whether, in the totality of the circumstances, the defendant was in custody while being questioned by Officer Waterman so that she should have provided *Miranda* rights to the defendant and secured a waiver of those rights.

The case of *State v. Michaud,* 1998 ME 251, ¶¶ 3-4, 724 A.2d 1222, 1225-26 reminds its readers that a defendant is in custody if he is either subject to a formal arrest, or is restrained in his freedom of movement "to the degree associated with a formal arrest." *Id.* ¶ 4, 724 A.2d at 1226. Because in this case the defendant was never formally arrested, the court must turn to the objective factors supplied by the Law Court in *Michaud* to determine whether the defendant was restrained "to the degree associated with a formal arrest," that is, "whether a reasonable person in the defendant's position would have believed he was in police custody and constrained to a degree associated with formal arrest." *Id.*

Using those factors listed in *Michaud* which are applicable to the question of custody in this case, the court concludes that Officer Waterman's interrogation of the defendant outside his truck was noncustodial so that the *Miranda* warnings were not legally required.

The most compelling fact which leads this court to this conclusion is that Officer Waterman, apparently out of concern for the defendant's emotional state, told him that she would not be summonsing him for the alcohol violation and would not arrest him for the drug violation, so that his fear of being taken to jail would be allayed. She also told him that the possession of the patch was "no big deal" and asked him to bring in his prescription for the patch to the police department at a later time. From this exchange, even though it included or began with a question or two concerning the fentanyl patch, a reasonable person would have understood that he was not under detention. Indeed, as it turned out, Officer Waterman let the defendant go home in his truck, albeit with a friend driving. So, any concerns that the defendant had about his status should have been calmed by the officer's response to his emotional state when she told him early on that she was going to "let him go" on the alcohol charge. That he

continued to be upset says more about his sobriety than any apprehension he may have reasonably felt while in the company of the police.

Next, the interrogation was quite brief and included perhaps two or three questions about the patch. It was also nonconfrontational as Officer Waterman, as noted, demonstrated a degree of empathy for the distress the defendant exhibited. Additionally, at no time was the defendant physically constrained during his brief exchange with Officer Waterman.

On the other hand, it was a uniformed police officer who initiated the contact and was joined by two other officers during her dealings with the defendant. After the patch was found, a reasonable person in the defendant's position would also have reason to believe that he was go be accused of its possession and that the circumstances suggested he might be arrested for this offense just as his friend had been moments earlier for a traffic crime.

Notwithstanding these observations, this brief interrogation of the defendant after a routine traffic stop is not markedly different from the noncustodial circumstances as characterized by the United States Supreme Court in *Berkemer v. McCarthy*, 468 U.S. 420, 437, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984), namely that questioning after a traffic stop carries with it the aura of the exercise of police authority with a suspect's knowledge that he is subject to the officer's exercise of discretion so that some pressure may be felt to answer questions, particularly where, as here, there is more than one officer present. But these circumstances are offset by the public nature of the transaction and, also as here, the presence of two friends who stood by and watched the proceedings.

Although the defendant has provided no evidence and no argument on this point, it is nevertheless incumbent on the court to also find that the brief exchange

between the defendant and Office Waterman on April 24, 2003, in which she asked him for the prescription for the patch, was also a noncustodial interrogation and his answer to this question must not be suppressed. There is also no evidence in this case that the defendant's brief responses to Officer Waterman's questions were provided involuntarily either on April 4, 2003, or on April 24, 2003. Indeed, the topic was not addressed by the defendant's testimony or in his post-hearing memorandum.

Finally, because the defendant was never arrested, there is no need to address his contention that he was arrested without probable cause.

From all this, the court finds that the State has established by a preponderance of the evidence that the interrogations of the defendant by Officer Waterman in the early morning hours of April 4, 2003, and later, on April 24, 2003, were noncustodial so that *Miranda* warnings and waivers were not required. The court also finds beyond a reasonable doubt that the defendant's statements to Officer Waterman on these occasions were provided voluntarily. Accordingly, this motion to suppress is to be denied.

The clerk is directed to make the following entry:

Both Motions to Suppress are DENIED.

So ordered.

Dated: April_22_, 2004

John R. Atwood
Justice, Superior Court

April 23, 2004

Attorney's Involved:

Defense Attorney: Robert Levine, Esq.
PO Box 248
Rockland, ME 04841
207-594-8400

For the State: Geoffrey Rushlau, Esq.
District Attorney
62 Union Street
Rockland, ME 04841
207-594-0424