STATE OF MAINE                                        SUPERIOR COURT
PENOBSCOT, SS.                                        CRIMINAL ACTION
                                                     DOCKET NO.: CR-03-480
                                                     JLH-PEN-5/11/2004

                    FILED & ENTERED
                    SUPERIOR COURT

State of Maine           MAY 1 1 2004                         DONALD L. ....... ...,
                                                                  LAS: ........
     v.              PENOBSCOT COUNTY          ORDER

Tammy S. Doyle                                                MAY 21 2004

        Hearing on the Defendant's motion to suppress was held on November 25, 2003,
and January 9, 2004. On both hearing dates, the defendant was present with counsel.
Following the hearing, the parties submitted written argument, which the court has
considered. The evidence in this case includes an audio tape recording of part of the
investigating officer's contact with the defendant. The court has listened to the tape.

        On May 3, 2003, Dexter Police Officer Fletcher was on routine patrol. At
approximately 9:10 p.m., he was driving toward the Dexter Motor Lodge in a southerly
direction on route 7 south of the center of Dexter. Fletcher observed an oncoming
vehicle approximately several hundred yards away. That vehicle, which was a pickup
truck operated by the defendant, turned into the motel driveway. Fletcher observed that
the beam from the headlights of the defendant's truck bounced as if the vehicle had not
stayed on the driveway proper. When the truck was roughly one car length into the
driveway, the defendant backed up onto route 7 so that approximately one-third of her
vehicle was in the northbound travel lane of route 7. Fletcher then observed another
vehicle driving northbound on route 7 toward the hotel driveway. Because the defendant
drove her truck back onto the road, the oncoming vehicle had to swerve around it,
thereby driving into the southbound lane toward Fletcher. Fletcher then had to swerve
partway into his breakdown lane to avoid the vehicle that was forced to maneuver around
the defendant's truck.

        The defendant then drove her truck back into the parking lot, and Fletcher
followed. He did not activate his emergency lights. The defendant stopped her truck on
her own. Fletcher walked to a spot near the driver's side door and shined his flashlight

                                            1

into the interior. The defendant was the only person in the truck. Fletcher observed that her cheeks were red and that her eyes appeared to be glassy. Initially, Fletcher did not see the police dog that in fact was inside the vehicle.[1] The defendant fumbled with the lock and window controls located on the inside of the driver's side door, and she either fully or mostly closed the driver's door window, which had been approximately halfway down. After Fletcher knocked on the window with either his hand or a flashlight, the defendant began to open her door to step out. Fletcher helped her open the door. The defendant did not have any difficulty getting out of her truck, but after she exited the vehicle she maintained her balance by holding the doorframe. She then shut the door and identified herself to Fletcher as a state trooper. When asked by Fletcher, she advised Fletcher that she trained police dogs in Vassalboro. As she talked, Fletcher noticed – and the audiotape confirms -- that she slurred her words and talked haltingly. In fact, her slurred speech prompted Fletcher to ask the defendant twice to identify the State Police division she worked with.

---

[1] The defendant challenges Fletcher's credibility in part based on his testimony that the defendant's police dog did not act aggressively toward him when he was near the defendant's truck and in fact that he (Fletcher) did not even initially realize that the dog was in the vehicle. The defendant presented evidence that the dog was trained to act aggressively when people approached a vehicle he was in and that the dog often actually does so on other occasions. Despite this evidence, however, the court accepts the testimony of Maine State Police Trooper Simpson (who was called to the scene to assist Fletcher) and the similar testimony of Fletcher that the dog was not aggressive or otherwise active at that time: in the end, the best evidence of the dog's actual behavior during the course of this event on May 3 is in fact the credible testimony of the two observers on the scene who saw the dog's actual conduct.

The defendant's analysis of the evidence focuses on Fletcher's credibility. However, the court finds Simpson's testimony to be credible. The essence of Simpson's testimony corroborates that of Fletcher not only regarding the dog's conduct but also other material issues, such as the state of the defendant's sobriety. Additionally, Fletcher's testimony is also consistent with and corroborated by the audiotape. This corroboration of Fletcher's testimony by these credible sources (namely, Simpson and the tape) renders Fletcher's own testimony credible as well. The defendant's challenge to Fletcher's credibility boils down to a contention that he testified truthfully about matters that overlap with the contents of the audiotape and the independent testimony of Simpson, but that he lied about the other portions of his investigation. The court concludes that these important levels of corroboration demonstrate that Fletcher's testimony in fact is credible and that it is not likely that he cherry picked issues and steered around the truth when he addressed those selective matters not covered by other evidentiary sources.

Fletcher asked her for identification, and the defendant stated that it was in her truck. She asked him if she could retrieve it. From the tape, it appears that Fletcher initially agreed to allow her to do so, but he then asked if she had any weapons in the truck. She replied that her service firearm was inside, along with the police dog. Fletcher then apparently did not want her to go inside of the truck but rather asked her to provide her date of birth verbally. The defendant became increasingly agitated and hostile toward Fletcher, and, apparently concerned that the matter would become public because of the prospects of radio transmissions about her identity, she insisted that Fletcher tell her what he intended to do with that information. She repeatedly told Fletcher that she had been with the State Police for 14 years and asked, "How can we take care of this?" She made similar requests for an accommodation a number of times during her encounter with Fletcher in the parking lot.

Fletcher asked the defendant how much she had had to drink. The defendant did not respond directly to this question but said that she had had a fight with her husband and did not want to stay home. Fletcher continued to ask the defendant for her date of birth, but the defendant declined to provide it. (Fletcher later told the defendant that he would arrest her if she refused to tell him her date of birth.) She repeatedly deferred the request, asking him many times what he intended to do with that information. She said that this incident would derail her police career, and she repeatedly and pointedly asked Fletcher if he was interested in pursuing his own career. She also told Fletcher – as she did a number of times during the encounter -- that he (through the investigation) could ruin her career with the Maine State Police. At one point, however, when Fletcher denied that he was ruining her career, she told him that she was not accusing him of this, even though she had made an explicit statement to the contrary moments earlier.

Close to the outset of his encounter with the defendant, Fletcher called for the assistance of other police officers because the defendant herself was a police officer and because, if he arrested her, he wanted to do so in the presence of another officer.[2] The

---

[2] The court's conclusion about the time when Fletcher radioed for backup assistance is based on the progression of events as revealed on the audiotape. It also takes into account Maine State Police Trooper Simpson's testimony that he received a call for backup shortly after 9:00 p.m., and that it took him approximately 30 minutes from the time of that dispatch to arrive at the scene. Additionally, the time frame is informed by

3

first assisting officer to arrive at the scene was Maine State Police Trooper Forrest Simpson, who arrived at approximately 9:40, which was roughly 30 minutes after Fletcher had his first contact with the defendant. During the interval prior to Simpson's arrival, Fletcher asked the defendant to submit to field sobriety tests. Several times, the defendant refused to do so. However, the Fletcher watched the defendant as she walked in the parking lot along a generally straight line. As she did so, she scuffed her feet. When she turned around, she lost her balance.

At some point, Fletcher formulated an intention to arrest the defendant. He did not advise the defendant of this intention until after other officers had arrived at the scene. While awaiting the arrival of those other officers, the defendant was not physically restrained and, for the most part, walked around the immediate area without restriction or limitation. At one point however, the defendant started to get into her truck and opened the door. She whistled, and her police dog, which was in the truck, jumped into the driver's seat. This prompted Fletcher to be concerned for his safety, and consequently he kicked the door shut. Additionally, the defendant continued to act belligerently towards Fletcher. She pointed her finger at Fletcher's chest and continued to approach him in a way that prompted him to retreat backward toward his cruiser. The defendant touched Fletcher, and as a result Fletcher pushed her away. He then unsnapped the holder, located on his belt, for his pepper spray. The defendant recognized that maneuver, became upset, and asked him if he thought she would allow him to use the spray on her. She then repeated to Fletcher that he was a Dexter police officer and that she was affiliated with the Maine State Police.

During much of the encounter between Fletcher and the defendant, she was belligerent and often profane toward him. It is apparent that she also tried to provoke Fletcher. Fletcher's responses to her were measured and appear to have been appropriate to her conduct. The defendant accused Fletcher of being difficult with her. Evidence of this encounter, however, does not bear out this assessment.

The first assisting officer to arrive was Trooper Simpson. Simpson previously had had contact with the defendant during police training, but he had not worked with her

Fletcher's own testimony that he waited at the scene with the defendant for approximately 30 minutes before other officers arrived.

4

or even spoken with her personally. When Simpson arrived, he observed Fletcher and the defendant (whom he did not immediately recognize) near the rear of her truck. He watched as the defendant walked quickly from that location toward the front of the truck and then get in the truck. Fletcher then ran around to the passenger side of the truck. Simpson got out of his cruiser and walked toward the truck. The defendant then got out of her truck and walked toward Simpson, which is when he recognized her. Simpson observed that the defendant stumbled as she exited her truck. The defendant approached Simpson so that she was within four or five feet of him. From that distance, Simpson smelled alcohol emanating from the defendant, and when the defendant spontaneously spoke to Simpson, he noticed that her speech was slurred, unclear, and loud. Simpson noted that she was agitated, and consequently he walked with her to the other side of his vehicle so that she would be further away from Fletcher. Simpson asked the defendant what was going on. The defendant then said that she was upset (she appeared to be near tears) and was facing a lot of problems that, she said, no one would understand. Among other things, she also said that she had had several drinks while waiting for friends. This conversation between Simpson and the defendant lasted between five and ten minutes. As of this point, Simpson had not spoken with Fletcher and was therefore unaware of the defendant's custodial status. However, he did not believe that the defendant was in custody because she appeared to do whatever she wanted to do and was not submitting to the control of any police officer. Simpson contacted his supervisor about the situation, and he told the supervisor that he believed that the defendant was intoxicated.

Simpson remained at the scene for approximately 30 minutes before he drove the defendant in his cruiser to the Dexter Police Department. During that half hour in the motel parking lot, the defendant said that she was cold, and, apparently with Simpson's permission, got into her truck. Before doing so, Simpson asked the defendant to give him her service firearm, and he allowed her to hand it to him. Simpson stated that he allowed her to do so only because of the unusual circumstances and does not allow others in that situation to handle a gun as he allowed her to do.

During the twenty or thirty minutes that elapsed between Simpson's arrival at the parking lot and the defendant's departure with Simpson to the Dexter police station, several other officers arrived. When each of those officers arrived, Fletcher ended up

5

briefing them about the situation, and so Fletcher spent little time with the defendant subsequent to the time Simpson arrived. There is no evidence that any of those other officers had direct dealings with the defendant. Thus, while Simpson was on the scene, the defendant was either with him alone or by herself.

The defendant argues that Fletcher did not have articulable suspicion of criminal activity needed to justify his investigatory detention of her. In her motion, she also contends that Fletcher did not have probable cause to arrest her. Finally, the defendant argues in a footnote that her statements to Simpson should be suppressed because they were the result of custodial interrogation without the benefit of Miranda warnings.

**A. Articulable suspicion.**

[¶11] "A police officer's encounter with a citizen implicates the Fourth Amendment only if the officer 'seizes' the citizen. . . .An officer seizes a citizen when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away. . . . An officer does not violate the Fourth Amendment by merely approaching a citizen on the street or in a parked vehicle in a public place." *State v. Brewer*, 1999 ME 58, ¶ 11, 727 A.2d 352, 355 (citations and internal punctuation omitted). Here, the defendant did not stop her vehicle in the hotel parking lot as the result of a fourth amendment seizure. Rather, she drove into the parking lot and stopped her vehicle there of her own device. Fletcher drove into the parking lot without activating the cruiser's emergency lights and without making any showing of authority. Fletcher then walked up to the driver's side of the defendant's truck and knocked on the window. The defendant rolled up the window most of the way and then started to get out of the vehicle. This is the earliest moment when she could be deemed to be seized because, arguably, she got out of the truck in response to an encounter with a police officer. If she was seized at that point, then the seizure is constitutionally proper only if Fletcher had articulable suspicion to believe that she had committed a criminal act.

An officer is justified in seizing a suspect in an investigatory stop if, at the time of the stop, the officer has an "articulable suspicion" of criminal activity and such suspicion is "objectively reasonable in the totality of the circumstances." *State v. Lear*, 1998 ME 273, ¶ 5, 722 A.2d 1266, 1267. Here, Fletcher suspected that the defendant had engaged

6

in improper and unsafe operation of her vehicle, and that suspicion was objectively and reasonably grounded in his observations of the way she drove her truck. For the reasons noted above, the court credits Fletcher's testimony that he saw the defendant drive her truck erratically because she appeared to miss the driveway entrance to the motel parking lot and then back out into route 7 into the path of an oncoming car. Even prior to the time Fletcher made his initial observations of the defendant's condition, he was entitled to detain her to investigate the circumstances of her driving maneuvers. Then, when Fletcher observed the defendant's physiological condition (her flushed appearance and glassy eyes) and had a verbal exchange, giving him the opportunity to listen to her impaired speech, he was fully justified in investigating the matter as a possible OUI.

Therefore, because the stop and continuing detention were preceded and supported by articulable suspicion, it was lawful and not in violation of the defendant's rights.

### B. Probable cause.

In her written argument, the defendant does not appear to challenge the basis for her eventual arrest. Nonetheless, at the outset of the hearing, counsel identified this issue as a basis for the defendant's motion, and the motion itself recites this as a ground for relief. Thus, the court addresses it here.

"Probable cause. . .exists when facts and circumstances of which the arresting officer has reasonably trustworthy information would warrant an ordinarily prudent and cautious officer to believe that the subject did commit or was committing a crime." *State v. Boylan*, 665 A.2d 1016, 1019 (Me. 1995). The court concludes that Fletcher had probable cause to arrest the defendant for OUI very shortly into his encounter with her. After observing her drive dangerously and without regard to oncoming traffic, he had direct contact with the defendant. He saw that her eyes were glassy and that her face was flush. Most significantly, however, as is shown clearly by the audiotape, the defendant's speech revealed strong evidence of impairment. She had problems articulating words, she spoke haltingly and her speech manifested a thought process that was less than cogent. All of these circumstances would justify a reasonable and prudent police officer in concluding that the defendant was impaired to any extent by the consumption of alcohol. Thus, the defendant's eventual arrest was supported by probable cause.

7

## C. Statements to Simpson.

Finally, the defendant seeks to suppress statements she made to Trooper Simpson while she conversed with him in the motel parking lot. In support of this argument, the defendant argues that she was in custody at the time she made the statements and that because none of the officers had advised her of her Miranda rights, the statements are inadmissible. Simpson's testimony establishes that the defendant made statements to him in response to his questions. Thus, the remaining and dispositive question on this issue is whether that interrogation was custodial.

A person is in custody for fifth amendment purposes if that person is under formal arrest or if a reasonable person in like circumstances would conclude that she was restrained to a degree associated with formal arrest. *State v. Higgins*, 2002 ME 77, ¶ 12, 796 A.2d 50, 54. If a suspect is detained but not in custody for fifth amendment purposes, then the suspect's statements are not subject to the Miranda requirements. *Berkemer v. McCarty*, 468 U.S. 420, 439-40, 82 L.Ed.2d 317, 334-35; *State v. Lavoie*, 562 A.2d 146, 148 (Me. 1989). Here, as is noted above, the defendant had been seized early in Fletcher's investigation and remained subject to an investigatory detention when Simpson arrived. Further, as is also noted above, there existed probable cause to arrest her. However, when the defendant talked with Simpson, she had not been arrested, and the court concludes that a reasonable person in her circumstances would not have concluded that she was restrained to a degree associated with formal arrest.

The defendant made the challenged statements to Simpson not long after he arrived at the scene, which was roughly thirty minutes after she became detained. However, throughout the, although she clearly was detained throughout the fifty or sixty minutes she was at the parking lot because she was not free to leave the officers' presence, the defendant was remarkably unrestrained. She freely walked around the area near her truck; she was never restrained physically; she felt at liberty to physically maneuver Fletcher so that he felt compelled to retreat toward his cruiser; when he responded by reaching for a chemical weapon, she virtually taunted him about his ability to use it against her; the defendant repeatedly attempted to establish some measure of superiority over Fletcher by reminding him of their respective positions in the law enforcement community and his prospects for advancement if her pursued his

8

investigation of her; Simpson acceded to her request to get back into her truck because she was cold; and Simpson even allowed her to hand her service weapon to him. The totality of the circumstances establishes that the defendant was not in custody when she answered Simpson's questions and otherwise talked with him in the motel parking lot. Therefore, neither Simpson nor any other investigating officer was obligated to advise the defendant of her Miranda rights as a predicate to any questioning.

Simpson testified that when he drove the defendant to the Dexter police station, she said several times that she "could not believe what was going on." There is no evidence that she expressed this sentiment in response to any interrogation. Therefore, even if the defendant were in custody in Simpson's cruiser, these comments are not subject to suppression because they were not the product of custodial interrogation.

The entry shall be:

For the foregoing reasons, the defendant's motion to suppress is denied.

Dated: May 9, 2004

_____
Justice, Maine Superior Court